DANIEL M. ORTNER (California State Bar No. 329866)
dortner@pacificlegal.org
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

GABRIEL Z. WALTERS (District of Columbia Bar No. 1019272)*
gabe.walters@thefire.org
JEFFREY D. ZEMAN (Pennsylvania Bar No. 328570)*
jeff.zeman@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473

*Attorneys for Plaintiffs*
*Pro Hac Vice* Motions Forthcoming

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO FLORES, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>DR. LORI BENNETT, ET AL.,<br><br>Defendants. | Civil Action No:<br>1:22-cv-01003-JLT-HBK<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: September 16, 2022<br>Time: 9:00am<br>Judge: The Honorable Jennifer L. Thurston |

1

**TABLE OF CONTENTS**

2

Page

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

I.   Plaintiffs Created a Student Chapter of Young Americans for
     Freedom at Clovis to Express Their Conservative Views. .......................... 3

II.  Defendants Approved and Then Removed Plaintiffs' Flyers
     Because of Their Viewpoint. ....................................................................... 3

III. Defendants Require Preapproval of Student Flyers and Ban
     "Inappropriate" or "Offens[ive]" Flyers. .................................................... 5

IV.  Defendants Banished Additional Flyers to a "Free Speech Kiosk"
     Because of Plaintiffs' Viewpoint. ............................................................... 6

V.   The Flyer Policy Continues to Suppress Plaintiffs' Speech. ....................... 7

ARGUMENT ..................................................................................................................... 7

I.   Plaintiffs Are Likely to Succeed on the Merits of Their Challenges
     to the Flyer Policy. ..................................................................................... 8

     A.   The Flyer Policy Creates an Unconstitutional Prior
          Restraint on Student Speech. ............................................................. 8

     B.   The Flyer Policy Discriminates on Its Face on the Basis of
          Viewpoint and Is Incapable of Reasoned Application. ..................... 9

          1.   The Flyer Policy discriminates on its face by
               banning "inappropriate" and "offens[ive]" speech. ............ 11

          2.   The Flyer Policy is facially unconstitutional because
               it unreasonably restricts speech without providing
               objective, workable standards. .......................................... 12

     C.   The Flyer Policy Is Impermissibly Overbroad. ............................... 13

     D.   The Flyer Policy Is Impermissibly Vague. ..................................... 14

          1.   The Flyer Policy fails to provide people of ordinary
               intelligence a reasonable opportunity to understand
               what conduct it prohibits. ................................................. 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

2. The Flyer Policy invites arbitrary and discriminatory enforcement. ...............................................15

E. The Flyer Policy Is Unconstitutional as Applied to Plaintiffs' Speech Because Defendants' Policy and Actions Discriminated on the Basis of Viewpoint. .......................................17

II. Plaintiffs Satisfy the Remaining Requirements to Obtain a Preliminary Injunction. ................................................18

A. Plaintiffs Will Continue to Be Irreparably Harmed Absent a Preliminary Injunction. ..................................................18

B. The Balance of Equities and the Public Interest Strongly Favor Plaintiffs. ................................................................19

C. Plaintiffs Should Not Be Required to Provide a Security Payment. ..........................................................................20

CONCLUSION ..............................................................................................20

1

# TABLE OF AUTHORITIES

**Page(s)**

2

**Cases:**

3

4

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)...................................................................... 7

5

*Am. Freedom Def. Initiative v. King Cnty.*,
   904 F.3d 1126 (9th Cir. 2018).......................................................... 9, 11, 15

6

7

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
   978 F.3d 481 (6th Cir. 2020).................................................................... 10

8

*Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
   636 F.2d 1084 (5th Cir.1981)...................................................................... 20

9

10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)........................................................................................ 8

11

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009)...................................................................... 8

12

13

*Brown v. La.*,
   383 U.S. 131 (1966).................................................................................... 18

14

15

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
   29 F.4th 468 (9th Cir. 2022) ...................................................................... 19

16

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
   766 F.2d 1319 (9th Cir. 1985)...................................................................... 20

17

18

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988).................................................................................... 15

19

20

*Coll. Republicans at S.F. State Univ. v. Reed*,
   523 F. Supp. 2d 1005 (N.D. Cal. 2007) .................................................... 14

21

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011)...................................................................... 13

22

23

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*,
   473 U.S. 788 (1985)................................................................................ 9, 10

24

25

*Corrigan Dispatch Co. v. Casa Guzman*,
   569 F.2d 300 (5th Cir. 1978)...................................................................... 20

26

*Ctr. for Investigative Reporting v. Se. Pa. Trans. Auth.*,
   975 F.3d 300 (3d Cir. 2020)...................................................................... 10

27

28

*Cuviello v. City of Vallejo*,
     944 F.3d 816 (9th Cir. 2019).........................................................................8, 19, 20

*Dahl v. HEM Pharms. Corp.*,
     7 F.3d 1399 (9th Cir. 1993)........................................................................................7

*Dambrot v. Cent. Mich. Univ.*,
     55 F.3d 1177 (6th Cir. 1995)......................................................................................16

*Davis v. Monroe Cnty. Bd. of Educ.*,
     526 U.S. 629 (1999)...................................................................................................18

*DeJohn v. Temple Univ.*,
     537 F.3d 301 (3d Cir. 2008).......................................................................................13

*Doe v. Harris*,
     772 F.3d 563 (9th Cir. 2014)......................................................................................19

*Drakes Bay Oyster Co. v. Jewell*,
     747 F.3d 1073 (9th Cir. 2014)....................................................................................19

*Elrod v. Burns*,
     427 U.S. 347 (1976)...................................................................................................18

*Epona v. Cnty. of Ventura*,
     876 F.3d 1214 (9th Cir. 2017)..................................................................................8, 9

*Foti v. City of Menlo Park*,
     146 F.3d 629 (9th Cir. 1998)......................................................................................15

*Freedman v. State of Maryland*,
     380 U.S. 51 (1965).......................................................................................................9

*Friends of the Earth v. Brinegar*,
     518 F.2d 322 (9th Cir. 1975)......................................................................................20

*FW/PBS, Inc. v. City of Dall.*,
     493 U.S. 215 (1990).....................................................................................................8

*Grayned v. City of Rockford*,
     408 U.S. 104 (1972)........................................................................................14, 15, 16

*Healy v. James*,
     408 U.S. 169 (1972).....................................................................................................1

*Hill v. Colorado*,
     530 U.S. 703 (2000)...................................................................................................14

*Johnson v. Couturier*,
     572 F.3d 1067 (9th Cir. 2009)....................................................................................20

v

*Jorgensen v. Cassiday,*
   320 F.3d 906  (9th Cir. 2003) ........................................................................... 20

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) ........................................................................................... 1

*Marshall v. Amuso,*
   571 F. Supp. 3d 412 (E.D. Pa. 2021) ............................................................... 15

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) ...................................................................................... 11

*McCauley v. Univ. of the V.I.,*
   618 F.3d 232 (3d Cir. 2010) ............................................................................. 13

*Minn. Voters All. v. Mansky,*
   138 S. Ct. 1876 (2018) ................................................................................. 12, 13

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ............................................................................................ 8

*NAACP v. City of Phila.*,
   834 F.3d 435 (3d Cir. 2016) ............................................................................. 10

*Ogilvie v. Gordon,*
   540 F. Supp. 3d 920 (N.D. Cal. 2020) ............................................................. 12

*Papish v. Bd. of Curators of the Univ. of Mo.*,
   410 U.S. 667 (1973) .......................................................................................... 11

*People for the Ethical Treatment of Animals, Inc. v. Shore Transit,*
   --- F. Supp. 3d ---, No. JKB-21-02083, 2022 WL 170645 (D. Md. Jan. 18, 2022) .......... 12

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983) .............................................................................................. 9

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .......................................................................................... 10

*Sammartano v. First Judicial Dist. Ct.,*
   303 F.3d 959 (9th Cir. 2002), *abrogated on other grounds*, 555 U.S. 7 .......... 18

*Seattle Mideast Awareness Campaign v. King Cnty.*,
   781 F.3d 489 (9th Cir.. 2015) ........................................................................... 10

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
   709 F.3d 1281 (9th Cir. 2013) ............................................................................ 7

*Shuttlesworth v. City of Birmingham,*
   394 U.S. 147 (1969) ........................................................................................ 8, 9

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Smith v. Goguen*,
    415 U.S. 566 (1974) ......................................................................................................... 15

*S.O.C., Inc. v. Cnty. of Clark*,
    152 F.3d 1136 (9th Cir. 1998) ......................................................................................... 18

*Texas v. Johnson*,
    491 U.S. 397 (1989) ......................................................................................................... 11

*United States v. Stevens*,
    559 U.S. 460 (2010) .................................................................................................. 13, 14

*United States v. Wunsch*,
    84 F.3d 1110 (9th Cir. 1996) ........................................................................................... 15

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ......................................................................................................... 13

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ........................................................................................... 19

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ......................................................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................................... 7, 18

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION**

A public college cannot censor its students because administrators deem their viewpoints "inappropriate or offens[ive]." Not only do college students receive the full protection of the First Amendment, *Healy v. James*, 408 U.S. 169, 180 (1972), but the Supreme Court has long made clear that the very future of our country "depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (internal quotation omitted). Clovis Community College nevertheless maintains a policy subjecting student speech to prior restraint, and prohibiting students from posting flyers that contain "inappropriate or offens[ive] language or themes." This policy grants Clovis administrators unbridled discretion to discriminate based on viewpoint, and engage in exactly the kind of "authoritative selection" the First Amendment abhors. The Court should enjoin this unconstitutional policy during the pendency of the litigation to protect the rights of student Plaintiffs to free speech.

Plaintiffs Alejandro Flores, Daniel Flores, and Juliette Colunga, founding members and officers of Plaintiff Young Americans for Freedom at Clovis Community College (YAF-Clovis), wish to continue to post flyers advocating their conservative political viewpoints on campus bulletin boards, including while this suit proceeds. However, Clovis's facially unconstitutional "Poster/Flyer Instructions" (the Flyer Policy), and Defendants' enforcement of it as applied to Plaintiffs' flyers, have chilled Plaintiffs' speech: Plaintiffs cannot know whether or what Defendants will allow them to post.

The Flyer Policy is facially unconstitutional for multiple reasons. It operates as a prior restraint against protected student speech. It bans speech on the basis of subjective "offense." It unreasonably fails to define "inappropriate or offens[ive] language or themes," and further fails to provide narrow, definite, and objective standards to guide administrators. It is unconstitutionally vague because a person of ordinary intelligence is left to guess at what is meant by flyers that contain "inappropriate or offens[ive] language or themes," which the Flyer Policy fails to define. It leaves such determinations to the arbitrary and discriminatory enforcement of Defendants in

their unfettered discretion. And it is unconstitutionally overbroad because a substantial number of its applications—like the censorship of Alejandro, Daniel, and Juliette's flyers—violate the First Amendment judged in relation to its legitimate sweep, which is minimal if not nonexistent. The Flyer Policy is also unconstitutional as applied to Plaintiffs' speech because it discriminates against their viewpoint in a public forum open to students, and fails to define the "inappropriate" or "offens[ive]" speech of Plaintiffs that restricts their flyers. This unconstitutional policy has prevented, and continues to prevent, Plaintiffs from participating in the free exchange of ideas on campus.

Plaintiffs accordingly move this Court to preliminarily enjoin Defendants from enforcing the Flyer Policy, especially given that they will be irreparably harmed if they are unable to share their views and recruit members in the same forum as other students, including during the 2022 fall semester, which began on August 8, 2022. Plaintiffs are likely to succeed on the merits of their facial and as-applied challenges to the Flyer Policy under the First and Fourteenth Amendments, the balance of the equities strongly weighs in Plaintiffs' favor, and a preliminary injunction is in the public interest.

## STATEMENT OF FACTS

Plaintiffs are founding members and student officers of Young Americans for Freedom at Clovis Community College (YAF-Clovis), a conservative student club that wants to post its flyers on campus bulletin boards that all other student clubs are permitted to use. Clovis administrators removed the group's flyers from those bulletin boards after allegedly receiving complaints that they made others uncomfortable—despite containing protected speech and images. Clovis deemed the flyers "inappropriate" or "offens[ive]" under its Flyer Policy and invented a pretextual, post-hoc justification for removing the flyers—that they "aren't club announcements." Administrators later used that same justification to deny another set of flyers Plaintiffs submitted for review, instead banishing them to a "Free Speech Kiosk" that students typically do not use because it sits too far from the only entrances to the academic buildings that are currently in use.

I. **Plaintiffs Created a Student Chapter of Young Americans for Freedom at Clovis to Express Their Conservative Views.**

Plaintiffs Alejandro Flores, Daniel Flores, and Juliette Colunga are students at Clovis Community College (Clovis), a community college in Fresno, California with more than 7,300 enrolled students. Verified Compl. ¶¶ 33, 36, 40, 46. Alejandro founded YAF-Clovis both to find like-minded students and to promote his own conservative political views to his peers. *Id.* ¶¶ 31–33. Daniel, who is Alejandro's cousin, joined YAF-Clovis because of his belief in the free market and the conservative value that success is the result of hard work. *Id.* ¶¶ 34, 37. Juliette, conservative in her political views because of her Catholic faith, was the president of a Young Americans for Freedom chapter in high school before joining YAF-Clovis. *Id.* ¶¶ 41–42.

Plaintiff YAF-Clovis is the student organization founded by Alejandro, Daniel, and Juliette and is a student chapter of Young Americans for Freedom, which is a project of the national advocacy group Young America's Foundation. *Id.* ¶ 44. According to the Young America's Foundation mission statement, it advocates for "individual freedom, a strong national defense, free enterprise, and traditional values." *Id.* ¶ 44.

To promote their conservative viewpoints and recruit new members to YAF-Clovis, Plaintiffs create and post flyers, some of which it receives from its parent organization Young America's Foundation, on campus for other students to see. *Id.* ¶¶ 39, 41.

II. **Defendants Approved and Then Removed Plaintiffs' Flyers Because of Their Viewpoint.**

In November of 2021, Plaintiffs obtained approval from the Clovis Student Center to post flyers with three different designs promoting a national campaign called Freedom Week (the Freedom Week Flyers), and put them up on bulletin boards in the halls of the two main academic buildings. *Id.* ¶ 58–62; *id.* Exs. A–C. The Freedom Week Flyers criticize communist and leftist regimes around the world. Verified Compl. ¶ 58; Exs. A–C.

On Monday, November 8, 2021, while the Freedom Week Flyers were still hanging on the walls of the Academic Centers, President Bennett, Vice President De La Garza, and Specialist Stumpf received an email from another staff member claiming that the Flyers made "several

1    people . . . very uncomfortable" and that one person said they would file a harassment claim if

2    Defendants did not take the flyers down. Verified Compl. ¶ 63; Hahn Decl. Ex. 1 at 1.

3        This email set off a flurry of replies that same day among Defendants about how to

4    remove the Freedom Week Flyers. Verified Compl. ¶ 64. Despite acknowledging to another staff

5    member that removing the flyers because of their viewpoint implicated students' free speech

6    rights, Specialist Stumpf responded that he would "gladly" take down the Freedom Week Flyers

7    on further instructions from his superiors. *Id.* ¶ 65; Hahn Decl. Ex. 2. Vice President De La Garza

8    responded by indicating that Defendants should review the guidelines that permitted Plaintiffs to

9    post the Freedom Week Flyers. Verified Compl. ¶ 66; Hahn Decl. Ex. 3. Specialist Stumpf agreed

10   and offered his colleagues the Flyer Policy's prohibition of "inappropriate or offens[ive] language

11   or themes" as a justification for removing the Freedom Week Flyers. Verified Compl. ¶ 67; Hahn

12   Decl. Ex. 4. But he added: "Since it is a political club, we have allowed political type posters

13   from the club before." Verified Compl. ¶ 67; Hahn Decl. Ex. 4.

14       Late that day, Specialist Stumpf told Dean Hébert that they had approved the Freedom

15   Week Flyers—"the same ones"—"a couple years ago," but that he had been "on the fence about

16   it" and wished he would have "held off" and sent to Dean Hébert first. Verified Compl. ¶ 69;

17   Hahn Decl. Ex. 6.

18       On Friday, November 12, President Bennett, in consultation with Vice President De La

19   Garza, ordered Dean Hébert to remove the Freedom Week Flyers from the bulletin boards, and

20   created a pretextual, post-hoc justification for doing so, in order to hide Defendants' viewpoint

21   discrimination: "If you need a reason, you can let them know that Marco [De La Garza] and I

22   agreed they aren't club announcements." Verified Compl. ¶ 71; Hahn Decl. Ex. 7 at 1. Over the

23   weekend, Dean Hébert ordered Specialist Stumpf to remove the Freedom Week Flyers.

24   Verified Compl. ¶ 73; Hahn Decl. Ex. 8. Defendants did not notify Plaintiffs of President

25   Bennett's decision to remove the Freedom Week Flyers. Verified Compl. ¶¶ 75–76.

26       Dean Hébert sent President Bennett's pretextual justification for removing the Freedom

27   Week Flyers to Specialist Stumpf and ordered him to keep it a secret: "Between you and me.

28   Please   don't   share   this   email.   Flyers   need   to   come   down   per   administration."

1    Verified Compl. ¶ 77; Hahn Decl. Ex. 8.

2         Clovis has no rule, policy, or consistent pattern or practice that requires student flyers to

3    contain "club announcements." Verified Compl. ¶ 72.

4    **III.   Defendants Require Preapproval of Student Flyers and Ban "Inappropriate" or**

5    **"Offens[ive]" Flyers.**

6         Clovis maintains and enforces a Flyer Policy that limits individual students, groups, and

7    clubs to only hanging flyers upon the indoor bulletin boards of the Academic Centers and

8    "permitted outdoor kiosks." Verified Compl. ¶ 52. The policy requires that, before going up

9    anywhere on campus, student flyers "must be approved and stamped by the Clovis Community

10   College Student Center Staff." *Id.* ¶ 53. Under the Flyer policy, failure to obtain preapproval "will

11   result in unapproved/unstamped flyers being removed and thrown away," and flyers "with

12   unapproved (post approval) writing will be removed." *Id.*

13        The Flyer Policy requires administrators to review the content and viewpoint of submitted

14   flyers in determining whether to approve them: "Posters with inappropriate or offens[ive]

15   language or themes are not permitted and will not be approved." *Id.* The Flyer Policy does not

16   define "inappropriate or offens[ive] language or themes." *See id.* Nor does it provide any

17   guidance whatsoever to administrators to determine whether the "language or themes" of student

18   flyers are "inappropriate" or "offens[ive]." *See id.*

19        Nothing in the Flyer Policy states that only flyers containing "club announcements" will

20   be allowed. *See id.* The rule against "inappropriate or offens[ive] language or themes" is the only

21   enumerated basis for denying student flyers. *See id.*

22        In their professional roles at Clovis, Defendants are responsible for the maintenance and

23   enforcement of the Flyer Policy. *Id.* ¶¶ 22–25. Dr. Lori Bennett is the President of Clovis.

24   *Id.* ¶ 22. Marco J. De La Garza is the Vice President of Student Services. *Id.* ¶ 23. Gurdeep

25   Hébert is the Dean of Student Services. *Id.* ¶ 24. Patrick Stumpf is a Senior Program Specialist for

26   Student Activities. *Id.* ¶ 25. President Bennett supervises Vice President De La Garza, who in

27   turn supervises Dean Hébert, who in turn supervises Specialist Stumpf. *Id.* ¶ 26.

28

IV.   **Defendants Banished Additional Flyers to a "Free Speech Kiosk" Because of Plaintiffs' Viewpoint.**

Defendants later used President Bennett's pretextual, post-hoc justification—that student flyers must contain "club announcements"—to banish Plaintiffs' additional flyers, because of the viewpoint they expressed, to a location on campus where they were unlikely to find an audience. In late November 2021, Alejandro, Daniel, and Juliette created a new set of five flyers advocating their pro-life viewpoint (the Pro-Life Flyers), in anticipation of the highly controversial U.S. Supreme Court case of *Dobbs v. Jackson Women's Health Organization*, which addressed the constitutionality of Mississippi's fifteen-week ban on abortions. Verified Compl. ¶ 80. Plaintiffs intended to use the Pro-Life Flyers to promote their viewpoint to their peers on campus contemporaneously with the news cycle around the oral argument in *Dobbs*, so on December 1, 2021, the day of the argument, they sought approval from Specialist Stumpf and Dean Hébert to hang the Pro-Life Flyers on the bulletin boards in the Academic Centers. *Id.* ¶¶ 81–82.

Alejandro and Daniel brought copies of the Pro-Life Flyers to the Student Center for approval, expecting based on prior experience that Student Center staff would approve the flyers within minutes while they waited. *Id.* ¶¶ 83–84. This time, however, Alejandro and Daniel waited on campus for nearly nine hours without receiving a decision. *Id.* ¶ 85. That day, Alejandro emailed Dean Hébert to ask about the status of the flyers, emphasizing Plaintiffs' intent to timely promote their viewpoint to their peers given that the *Dobbs* oral argument had occurred earlier that day. *Id.* ¶ 86. The next day, on December 2, 2021, Dean Hébert responded, denying Plaintiffs' request to hang the Pro-Life Flyers on the indoor bulletin boards, without explanation. *Id.* ¶ 87. Instead, Dean Hébert advised, Plaintiffs could post the Flyers on an outdoor "Free Speech Kiosk," a small box located in a remote part of campus Clovis students seldom, if ever, visit. *Id.* ¶¶ 88–95.

On December 3, 2021, Alejandro sent Dean Hébert an email asking why she had denied Plaintiffs' request to post the Pro-Life Flyers on the indoor bulletin boards of the Academic Centers. *Id.* ¶ 96. Ten days after the students' initial request, on December 10, 2021, Dean Hébert finally replied that Clovis generally permits only the posting of announcements regarding groups,

events, and services on interior hallways, repeating the same pretextual, post-hoc justification President Bennett created for removing Plaintiffs' Freedom Week Flyers the month before. *Id.* ¶¶ 97–98.

**V.    The Flyer Policy Continues to Suppress Plaintiffs' Speech.**

The Flyer Policy is still in effect. *Id.* ¶ 106. Plaintiffs intend to post the Freedom Week Flyers during the 2022 fall semester, which began on August 8, 2022—especially from November 7-12 during Freedom Week. *Id.* ¶ 108. Plaintiffs intend to post the Pro-Life Flyers and flyers containing similar political and social messages during the 2022 fall semester and beyond. *Id.* ¶ 109. Although Plaintiffs originally intended to post the Pro-Life Flyers contemporaneously with the news cycle surrounding the December 1, 2021 arguments in *Dobbs v. Jackson Women's Health Organization*, those flyers are not specific to that case or that date, and the debate over abortion continues in public discourse across the country. *Id.* ¶ 110. But for the Flyer Policy and Defendants' actions in removing such flyers and denying approval to place them on the bulletin boards of the Academic Centers, Plaintiffs would post the Freedom Week Flyers, the Pro-Life Flyers, and flyers containing similar political and social messages, during the 2022 fall semester and beyond. *Id.* ¶ 111.

**ARGUMENT**

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, plaintiffs must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013). In applying the four-part *Winter* test, the Ninth Circuit balances each part, "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A movant seeking a mandatory preliminary injunction in the Ninth Circuit must show that the facts and law "clearly favor" the moving party. *See, e.g.*, *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993). Plaintiffs easily meet these requirements.

7

**I.     Plaintiffs Are Likely to Succeed on the Merits of Their Challenges to the Flyer Policy.**

Plaintiffs are likely to succeed on the merits of their claims. The Flyer Policy is facially unconstitutional because it: (a) creates a prior restraint on protected student speech; (b) discriminates on the basis of viewpoint while being incapable of reasoned application; (c) is impermissibly vague; and (d) overbroad. Additionally, the Flyer Policy and Defendants' actions in banning the Freedom Week Flyers and Pro-Life Flyers from the Academic Centers' bulletin boards are unconstitutional as applied to Plaintiffs' speech.

**A.     The Flyer Policy Creates an Unconstitutional Prior Restraint on Student Speech.**

By requiring preapproval of the content of student speech in a public forum, the Flyer Policy acts as a prior restraint on student speech, which is a form of regulation highly disfavored by the First Amendment. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971). The Ninth Circuit has recognized "the special injury caused by permit systems as a form of prior restraint." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019). "Permit systems represent a departure from our tradition of public discourse by requiring a citizen to seek approval from the government to engage in speech." *Id.* (citing *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009) ("Almost every . . . circuit . . . ha[s] refused to uphold registration requirements that apply to individual speakers or small groups in a public forum.").

"[A]ny system of prior restraint comes to [the court] bearing a heavy presumption against its constitutional validity." *Epona v. Cnty. of Ventura*, 876 F.3d 1214, 1222 (9th Cir. 2017) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990)); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (same). An "ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint." *FW/PBS, Inc.*, 493 U.S. at 226 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969)). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow,

objective, and definite standards to guide the licensing authority, is unconstitutional." *Epona*, 876 F.3d at 1222 (citing *Shuttlesworth*, 394 U.S. at 150–51).

A prior restraint is presumptively unconstitutional unless it "takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. State of Maryland*, 380 U.S. 51, 58 (1965). Specifically, *Freedman* requires three such safeguards: (1) the state bears the burden of proving that the speech is unprotected; (2) an adversarial proceeding and judicial determination of whether the speech is protected; and (3) the state must "within a specified brief period, either issue a license or go to court to restrain" the speech. *See id.* at 58–59.

Clovis's Flyer Policy requires preapproval of all student flyers, or else the flyers will be removed and thrown away. Verified Compl. ¶ 53. By requiring Defendants' preapproval before students may post flyers on the indoor bulletin boards of the Academic Centers, these provisions act as a presumptively unconstitutional prior restraint. Despite this, the Flyer Policy contains none of the procedural safeguards required by *Freedman* to overcome the presumption of unconstitutionality; indeed, there are no procedural safeguards of any kind. *See id.* Defendants review Plaintiffs' flyers and determine whether they will be approved; their content- and viewpoint-based determination is final.

## B. The Flyer Policy Discriminates on Its Face on the Basis of Viewpoint and Is Incapable of Reasoned Application.

The Flyer Policy's ban on "inappropriate" or "offens[ive]" speech is facially unconstitutional because it discriminates on the basis of viewpoint and is incapable of reasoned application. "[I]t is settled law that, in a nonpublic forum, regulations must be reasonable and viewpoint neutral." *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131 (9th Cir. 2018) (citing *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("[T]he state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). A public college cannot limit students' access to a limited public forum because of the viewpoint that their speech expresses. *Rosenberger v. Rector &*

1    *Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995); *Widmar v. Vincent*, 454 U.S. 263, 277 (1981).

2           Clovis has clearly created a forum for student use in the Academic Center bulletin boards.

3    In cases applying public forum analysis, the Ninth Circuit "focus[es] on the government's intent."

4    *See, e.g.*, *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496–97 (9th Cir..

5    2015) (citing *Cornelius*, 473 U.S. at 802). To create a designated public forum, "the government

6    must intend to grant 'general access' to its property for expressive use, either by the general

7    public or by a particular class of speakers." *Id.* at 497 (citing *Ark. Educ. Television Comm'n v.*

8    *Forbes*, 523 U.S. 666, 679 (1998); *Widmar*, 454 U.S. at 267–68 (designated public forum created

9    for student groups)). "In contrast, when the government intends to grant only 'selective access,'

10   by imposing either speaker-based or subject matter limitations, it has created a limited public

11   forum." *Id.* (citations omitted).

12          The Court need not determine the precise nature of the forum created by Clovis's

13   Academic Center bulletin boards, because they were held open, at a minimum, for use by student

14   groups and the restrictions Clovis has put on speech are viewpoint discriminatory and

15   unreasonable, which violates the U.S. Constitution in any forum. *See NAACP v. City of Phila.*,

16   834 F.3d 435, 442 (3d Cir. 2016) (declining to determine the nature of the public forum because

17   the fact that the "ban on noncommercial content is unreasonable means that it is unconstitutional

18   no matter what we label the forum"); *Ctr. for Investigative Reporting v. Se. Pa. Trans. Auth.*, 975

19   F.3d 300, 314 (3d Cir. 2020) (assuming without deciding upon the nature of the public forum

20   because the ban on political speech was unreasonable); *Am. Freedom Def. Initiative v. Suburban*

21   *Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 493 (6th Cir. 2020) ("In the end, we need not

22   resolve this question. SMART's Advertising Guidelines violate the Free Speech Clause even

23   under the more forgiving review that applies to nonpublic forums.").

24          Clovis holds its indoor bulletin boards open for use by all Clovis departments, students

25   and student groups. Verified Compl. ¶ 52. Consequently, Clovis has created at least a limited

26   public forum and the Flyer Policy fails because its prohibitions on "inappropriate" or

27   "offens[ive]" speech are viewpoint discriminatory and unreasonable.

28

1        **1.**        **The Flyer Policy discriminates on its face by banning "inappropriate"**

2                  **and "offens[ive]" speech.**

3        "If there is a bedrock principle underlying the First Amendment, it is that the government

4 may not prohibit the expression of an idea simply because society finds the idea itself offensive or

5 disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). A government regulation violates the

6 First Amendment if it favors some viewpoints and discriminates against others, including those

7 messages that it deems offensive. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (plurality).

8 "[O]ffensive speech is, itself, a viewpoint and . . . the government engages in viewpoint

9 discrimination when it suppresses speech on the ground that the speech offends." *Am. Freedom*

10 *Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131 (9th Cir. 2018). Likewise, the government may

11 not ban speech on the ground that society finds the speech inappropriate. *Papish v. Bd. of*

12 *Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no

13 matter how offensive to good taste—on a state university campus may not be shut off in the name

14 alone of 'conventions of decency.'").

15        In *Matal*, the Supreme Court held that the U.S. Patent and Trademark Office's prohibition

16 on marks that may "disparage . . . or bring . . . into contemp[t] or disrepute" any "persons, living

17 or dead" violates the First Amendment. 137 S. Ct. at 1751. As Justice Kennedy described in his

18 concurrence, the policy at issue permitted benign marks but not derogatory ones, and thus

19 reflected "the Government's disapproval of a subset of messages it finds offensive. This is the

20 essence of viewpoint discrimination." *Id.* at 1766 (Kennedy, J., concurring). *See also Am.*

21 *Freedom Def. Initiative*, 904 F.3d at 1131 (noting that, although two four-Justice opinions in

22 *Matal* "characterized some of the sub-issues differently," "all eight Justices (Justice Gorsuch was

23 recused) held that offensive speech is, itself, a viewpoint and that the government engages in

24 viewpoint discrimination when it suppresses speech on the ground that the speech offends.").

25        Under Clovis's Flyer Policy, student flyers "with inappropriate or offens[ive] language or

26 themes are not permitted and will not be approved." Verified Compl. ¶ 53. This prohibition on

27 offensive speech is facially unconstitutional under *Matal*, *Papish*, and *American Freedom*

28 *Defense Initiative*. For this reason, Plaintiffs are likely to prevail on their facial First Amendment

1    challenge to the Flyer Policy.

2                   **2.     The Flyer Policy is facially unconstitutional because it unreasonably**

3                           **restricts speech without providing objective, workable standards.**

4          The Flyer Policy also violates Plaintiffs' First Amendment rights because it imposes

5    unreasonable restrictions on their speech in a public forum. Though the reasonableness standard

6    imposes a relatively forgiving level of scrutiny, in a public forum, "the State must be able to

7    articulate some sensible basis for distinguishing what may come in from what must stay out."

8    *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018). In other words, the restriction on

9    speech must be "capable of reasoned application." *Id.* at 1892. The Flyer Policy's prohibition on

10   "inappropriate or offens[ive] language" provides no such sensible basis and is incapable of

11   reasoned application.

12         In *Mansky*, the Court found that a state regulation banning "political" apparel from polling

13   locations, without defining that term, violated the First Amendment. *Id.* at 1888. The "unmoored"

14   use of the word "political," combined with haphazard interpretations the state provided in

15   guidance documents and in representations to the Court, caused the prohibition to fail even the

16   "forgiving" reasonableness test. *Id.* The Court held that government discretion "must be guided

17   by objective, workable standards. Without them, [an official's] own politics may shape his views

18   on what counts as 'political'." *Id.* at 1891.

19          Following *Mansky*, courts have had no trouble concluding that bans on "inappropriate" or

20   "offens[ive]" speech, without definitions or workable standards, fail the reasonableness test.

21   *See, e.g.*, *Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 930–31 (N.D. Cal. 2020) ("Because there is no

22   objective, workable standard of what is 'offensive to good taste and decency,' different reviewers

23   can reach opposing conclusions on whether a certain configuration should be rejected based on

24   their judgment of what might be 'offensive' or not in 'good taste.'"); *People for the Ethical*

25   *Treatment of Animals, Inc. v. Shore Transit*, --- F. Supp. 3d ---, No. JKB-21-02083, 2022 WL

26   170645, at *8–9 (D. Md. Jan. 18, 2022) (applying *Mansky* and finding unreasonable a ban on

27   speech that is "controversial, offensive, objectionable, or in poor taste").

28          Likewise, the Flyer Policy's ban on "inappropriate" or "offens[ive]" speech, without

                                                        12

defining those terms, provides no sensible basis for distinguishing what may come in from what must stay out of the public forum. There are no objective standards by which a Clovis Community College official may determine whether student speech is "inappropriate" or "offens[ive]." The Flyer Policy provides no definition for those terms, and no guidance at all by which administrators can determine what may be posted and what must not be posted on the indoor bulletin boards of the Academic Centers. Verified. Compl. ¶¶ 53–57. Defendants' approval and subsequent removal of YAF content, *id.* ¶¶ 60–78; Hahn Decl. Exs. 1–9, and Specialist Stumpf's apparent inability to determine whether a "political type" student organization's content should rather be classified as "offens[ive]," Verified Compl. ¶¶ 67, 69; Hahn Decl. Ex. 4, demonstrate that Defendants have no "sensible basis for distinguishing what may come in from what must stay out" of this public forum. *Mansky*, 138 S. Ct. at 1888.

### C.      The Flyer Policy Is Impermissibly Overbroad.

The Flyer Policy is unconstitutionally overbroad because within its prohibition on "inappropriate" or "offens[ive]" speech, it sweeps a substantial number of applications to protected speech, as judged in relation to its minimal, if not nonexistent, legitimate sweep. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). "The overbreadth doctrine exists 'out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech . . . .'" *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 944 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

Courts confronting such overbroad policies in the context of higher education have routinely declared them unconstitutional and enjoined their enforcement. *See, e.g.*, *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 250, 252 (3d Cir. 2010) (holding that a ban on "offens[ive]" speech has no plainly legitimate sweep and its overbreadth is substantial both in an absolute sense and relative to its legitimate sweep); *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008) (holding that a ban on creating an "offens[ive]" environment is sufficiently broad on its face that it "could conceivably be applied to cover any speech" and therefore "provides no shelter for core protected speech"); *Coll. Republicans at S.F. State Univ. v. Reed*,

1    523 F. Supp. 2d 1005 (N.D. Cal. 2007) (enjoining enforcement of civility policy).

2          The Flyer Policy is unconstitutionally overbroad on its face, allowing the College and its

3    administrators to deny or remove flyers like Plaintiffs' that are protected by the First Amendment,

4    but express viewpoints that the College wishes to suppress. Administrators could apply the Flyer

5    Policy's ban on "offens[ive]" speech to innumerable other instances of protected expression, no

6    matter the viewpoint. For example, administrators could block student flyers that say "Blue Lives

7    Matter" or "Black Lives Matter." They could block student flyers that carry Pride flags or flyers

8    that exhort students to "Support Traditional Marriage." Any flyer that expresses a viewpoint on a

9    matter of public concern or debate could be deemed offensive by adherents to the opposing view.

10         Moreover, the Flyer Policy's prohibition on "inappropriate or offens[ive] language or

11   themes" has *no* legitimate sweep because it violates the Constitution on its face. But assuming it

12   does have some legitimate sweep, its potential unconstitutional applications are far more

13   substantial; that number is effectively limitless because it encompasses disfavored viewpoints on

14   any political, social, or economic issue of public concern or debate. While Clovis could

15   permissibly regulate student expression that is categorically unprotected by the First

16   Amendment—such as obscenity, incitement, or fighting words, *see Stevens*, 559 U.S. at 468–

17   69—the Flyer Policy far exceeds these specific legal bounds by prohibiting all student speech

18   administrators subjectively find "inappropriate or offens[ive]." It therefore restricts expression far

19   beyond any conceivable "legitimate sweep." *Id.* at 473.

20         **D.    The Flyer Policy Is Impermissibly Vague.**

21         The Flyer Policy, by prohibiting "inappropriate or offens[ive] language or themes," is also

22   unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment.

23   "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to

24   provide people of ordinary intelligence a reasonable opportunity to understand what conduct it

25   prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."

26   *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Grayned v. City of Rockford*, 408 U.S. 104,

27   108–09 (1972). Vagueness is of special concern in the First Amendment context, because when a

28   vague regulation "abut[s] upon sensitive areas of First Amendment freedoms, it operates to

inhibit the exercise of [those] freedoms." *Grayned*, 408 U.S. at 109 (citation omitted). Where the scope of a policy reaches expression protected by the First Amendment, the Fourteenth Amendment vagueness doctrine demands the policy contain "a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). "Therefore, when government censors control access to a forum, but have no standards to govern their decisions, first amendment freedoms are abridged." *Am. Freedom Def. Initiative*, 904 F.3d at 372 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756–57 (1988) (holding unconstitutional a permitting scheme that placed unbridled discretion in the hands of a government censor)). Additionally, "the overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based on objective and clear standards." *Am. Freedom Def. Initiative*, 904 F.3d at 372.

1.     **The Flyer Policy fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.**

The Flyer Policy is unconstitutionally vague because its prohibition on "inappropriate or offens[ive] language or themes" fails to provide students with "fair warning" of what expression the policy prohibits. *Grayned*, 408 U.S. at 108. This kind of insufficient clarity regarding what is permissible and what is not may result in a "chilling effect on the exercise of First Amendment freedoms." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998), as amended on denial of reh'g (July 29, 1998) (citing *Grayned*, 408 U.S. at 108–109). The Flyer Policy does not offer any definition of "inappropriate or offens[ive], and those terms do not carry with them any reasonably objective plain meaning. *See, e.g.*, *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (invalidating as unconstitutionally vague statute that prohibited attorneys from engaging in "offensive personality"); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) ("What may be considered . . . 'offensive,' . . . 'inappropriate,' or 'otherwise inappropriate' varies from speaker to speaker, and listener to listener.").

2.     **The Flyer Policy invites arbitrary and discriminatory enforcement.**

The Flyer Policy is also unconstitutionally vague because it not only authorizes but

expressly requires administrators to discriminate against student viewpoints they find "inappropriate or offens[ive]," while giving them unbridled discretion to determine what those terms mean. A restriction on speech is void for vagueness when it fails to provide "explicit standards" to prevent "arbitrary and discriminatory enforcement" by administrators. *Grayned*, 408 U.S. at 108–09.

As the Flyer Policy provides: "Posters with inappropriate or offens[ive] language or themes are not permitted and will not be approved." Verified Compl. ¶ 53. Administrators are therefore required to discriminate against "inappropriate or offens[ive]" viewpoints. Furthermore, the Flyer Policy provides no guidance by which administrators may determine whether speech is "inappropriate or offens[ive]." The Flyer Policy gives administrators unbridled discretion to censor students because the terms "inappropriate" and "offens[ive]" are so vague they could be employed to prohibit nearly any student speech. Different administrators will naturally come to different conclusions as to whether the same speech falls within those terms. The First Amendment does not permit such a result. *See, e.g.*, *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1184–85 (6th Cir. 1995) (holding that university policy was vague where it prohibited "offensive" speech since there was no objective way to determine what speech was offensive).

Specialist Stumpf, vested with unbridled discretion to determine whether Plaintiffs' Freedom Week Flyers were "inappropriate" or "offens[ive]," waffled. He was "on the fence about" approving the Freedom Week Flyers in November 2021. Verified Compl. ¶¶ 63, 69; Hahn Decl. Ex. 6. However, he admitted he previously had approved those same flyers. Verified Compl. ¶ 69; Hahn Decl. Ex. 6. Stumpf indicated he would "gladly" remove the flyers, and that he never should have approved them in the first place, under the "inappropriate" or "offens[ive]" provision. Verified Compl. ¶ 65; Hahn Decl. Exs. 2–4. Defendants invented and applied a pretextual, post-hoc justification for the removal—"if you need a reason, you can let [the students] know that [Vice President] Marco [De La Garza] and I agreed they aren't club announcements"—that does not appear in the text of the Flyer Policy and has never been a practice of Clovis Community College. Verified Compl. ¶ 71. Defendants' failure to enforce the Flyer Policy clearly and consistently highlights the amount of arbitrary discretion it gives them.

1    For these reasons, Plaintiffs are likely to succeed on their facial challenge to the Flyer

2    Policy for vagueness.

3    **E.    The Flyer Policy Is Unconstitutional as Applied to Plaintiffs' Speech Because**

4    **Defendants' Policy and Actions Discriminated on the Basis of Viewpoint.**

5    The Flyer Policy is not only facially unconstitutional because it bans "inappropriate" or

6    "offens[ive]" speech—it is also unconstitutional as applied to Plaintiffs' Freedom Week and Pro-

7    Life Flyers. The terms "inappropriate" and "offens[ive]" are not viewpoint neutral as applied to

8    Plaintiffs' speech. Defendants singled out Plaintiffs' flyers for disfavored treatment because the

9    flyers express anti-communist and pro-life viewpoints that Defendants and others deemed

10   offensive.

11   Defendants invoked the Flyer Policy to remove the Freedom Week Flyers from the indoor

12   bulletin boards of the Academic Centers. Verified Compl. ¶ 70; Hahn Decl. Ex. 4. Defendants

13   also invoked a pretextual, post-hoc justification to remove the Freedom Week Flyers from the

14   bulletin boards and to banish the Pro-Life Flyers to the "Free Speech Kiosk": that their flyers did

15   not contain "club announcements." Verified Compl. ¶ 71; Hahn Decl. Ex. 7 at 1. No other student

16   group has been disfavored this way. Verified Compl. ¶¶ 51, 99. In fact, there is no requirement in

17   the Flyer Policy or elsewhere that student flyers must contain club announcements.

18   Verified Compl. ¶¶ 53–54, 72. Understanding President Bennett's post-hoc justification to be

19   pretextual, Dean Hébert went so far as to instruct Specialist Stumpf to keep it a secret. Verified

20   Compl. ¶ 77; Hahn Decl. Ex. 8.

21   That others may have been "uncomfortable" with the Freedom Week Flyers,

22   Verified Compl. ¶ 63, does not create a constitutionally defensible reason for Defendants to

23   remove Plaintiffs' protected speech from the bulletin boards of the Academic Centers. This is just

24   another way of saying that someone deemed the flyers "inappropriate" or "offens[ive]."

25   Nor does the fact that one person allegedly threatened to "file a harassment claim," *id.*,

26   create a constitutionally defensible reason for Defendants to remove the Freedom Week Flyers.

27   The Freedom Week Flyers do not fall within the standard for student-to-student harassment

28   punishable within the limits of the First Amendment as the U.S. Supreme Court defined it in

17

*Davis v. Monroe County. Board of Education*, 526 U.S. 629, 631 (1999), as having to be "so severe, pervasive, and objectionably offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." If anything, Defendants' capitulation to this criticism served no purpose but to effectuate a heckler's veto by ordering removal of the Freedom Week Flyers because of the hostile reactions of others who were merely offended by Plaintiffs' viewpoints. *See, e.g., Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (recognizing that the state must not allow a heckler's veto to strip peaceful speakers of their speech rights).

By banning from its indoor bulletin boards—a public forum—speech that is "inappropriate or offens[ive]" the Flyer Policy discriminates based on viewpoint in violation of the First Amendment and Plaintiffs are likely to succeed on their as-applied claim for viewpoint discrimination.

## II. Plaintiffs Satisfy the Remaining Requirements to Obtain a Preliminary Injunction.

Plaintiffs satisfy the remaining preliminary injunction factors, namely, that they would suffer irreparable harm; that the balance of equities tips in their favor; and that an injunction would be in the public interest. *Winter*, 555 U.S. at 20. In a First Amendment case where the plaintiff has shown a likelihood of success on the merits, the remaining preliminary injunction factors also are almost necessarily met. *See, e.g.*, *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 972–75 (9th Cir. 2002), *abrogated on other grounds*, 555 U.S. 7; *see also S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998) (holding that a civil liberties organization that had demonstrated probable success on the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable harm).

### A. Plaintiffs Will Continue to Be Irreparably Harmed Absent a Preliminary Injunction.

Plaintiffs will be irreparably harmed if the challenged policy is not enjoined while this litigation is pending. The Flyer Policy violates the Plaintiffs' First Amendment freedoms. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the Ninth Circuit, "a party

1    seeking preliminary injunctive relief in a First Amendment context can establish irreparable

2    injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First

3    Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005).

4         Plaintiffs have demonstrated that the Flyer Policy facially operates as a prior restraint, that

5    it is viewpoint discriminatory and incapable of reasoned application, impermissibly overbroad

6    and vague. Additionally, Plaintiffs have demonstrated that the Flyer Policy and Defendants'

7    actions enforcing it are unconstitutional as applied to Plaintiffs' speech. The Flyer Policy thus

8    violates Plaintiffs' First Amendment rights every day that it remains in place. *See Cuviello*,

9    944 F.3d at 832 ("As long as [the permit requirement for use of sound-amplifying devices]

10   remains in effect, the threat of enforcement against [the plaintiff] will persist, chilling his exercise

11   of free speech rights. For these reasons, [the plaintiff] has shown irreparable harm."). This is

12   especially so because every day of the 2022 fall semester that Plaintiffs are unable to post flyers

13   on the indoor bulletin boards of the Academic Centers because of the Flyer Policy and

14   Defendants' discriminatory enforcement of it, is another day lost to recruit new members and

15   promote their viewpoints to their peers.

16        **B.     The Balance of Equities and the Public Interest Strongly Favor Plaintiffs.**

17        Because the government is a party in the case, the "balance of equities" and "public

18   interest" elements merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

19   The balance of equities tips strongly in favor of Plaintiffs, as does the public interest. The Ninth

20   Circuit has "consistently recognized the significant public interest in upholding First Amendment

21   principles," *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482

22   (9th Cir. 2022) (citing *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)); *see also Cuviello*, 944

23   F.3d at 834. And Plaintiffs have a stronger interest in the Court enjoining the Flyer Policy than

24   Clovis has in continuing to enforce it.

25        Plaintiffs' interest is significant: prevention of the ongoing loss of ability to exercise their

26   First Amendment rights. *See Cuviello*, 944 F.3d at 834 (citing *Harris*, 772 F.3d at 583). But for

27   the Flyer Policy and Defendants' discriminatory enforcement of it, Plaintiffs would post flyers on

28   the indoor bulletin boards of the Academic Centers, where other groups are permitted to post

flyers, and reach their intended audience. Defendants, meanwhile, have no legitimate interest, let alone a significant one, in enforcing a policy that facially violates their students' constitutional rights as Clovis cannot marshal "record evidence that a preliminary injunction will seriously hamper significant governmental interests." *Id.*

**C.      Plaintiffs Should Not Be Required to Provide a Security Payment.**

The Court should not require Plaintiffs to provide a security payment because there is no realistic likelihood of harm to Defendants if the Court grants a preliminary injunction. While a preliminary injunction movant may be required to provide security in an amount sufficient to compensate a party found to have been wrongfully enjoined, Fed. R. Civ. Pro. 65(c), "'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003)). Thus, "[d]espite the seemingly mandatory language" of the rule, this Court "may dispense with . . . a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" *Id.* And as is particularly applicable here, with a movant engaged in litigation in the public interest, the Court "has discretion to dispense with the security requirement," especially where the likelihood of success on the merits tips in favor of the public-interest litigant *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (citing *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975)). As there is no realistic likelihood of harm to Defendants should the Court grant the preliminary injunction, and Plaintiffs seek to vindicate their First Amendment rights in a manner that will benefit the entire Clovis student body by precluding enforcement of an unconstitutional policy, and have demonstrated a high likelihood of success on the merits, the Court should not require a security payment.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: August 11, 2022

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    Respectfully submitted,

2

3            /s/ Daniel M. Ortner
        DANIEL M. ORTNER (California State Bar No. 329866)
4        dortner@pacificlegal.org
        555 Capitol Mall, Suite 1290
5        Sacramento, CA 95814
        Telephone: (916) 419-7111
6        Facsimile: (916) 419-7747

7        GABRIEL Z. WALTERS (District of Columbia Bar No. 1019272)*
        gabe.walters@thefire.org
8        JEFFREY D. ZEMAN (Pennsylvania Bar No. 328570)*
        jeff.zeman@thefire.org
9        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
        510 Walnut Street, Suite 1250
10       Philadelphia, PA 19106
        Telephone: (215) 717-3473
11

12       *Attorneys for Plaintiffs*
13       **Pro Hac Vice* Motions Forthcoming

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION