1
2
3
4
5
6
7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11
12
13

ALEJANDRO FLORES; DANIEL FLORES;
JULIETTE COLUNGA; and YOUNG
AMERICANS FOR FREEDOM AT CLOVIS
COMMUNITY COLLEGE,

14

Plaintiffs,

15

v.

16
17
18
19
20
21
22

DR. LORI BENNETT, in her individual and
official capacities as President of Clovis
Community College; MARCO J. DE LA
GARZA, in his individual and official
capacities as Vice President of Student
Services at Clovis Community College;
GURDEEP HÉBERT, in her individual and
official capacities as Dean of Student Services
at Clovis Community College; and PATRICK
STUMPF, in his individual and official
capacities as Senior Program Specialist at
Clovis Community College,

23

Defendants.

24

Case No.  1:22-cv-01003-JLT-HBK

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION AND
DENYING MOTION TO FILE
SUPPLEMENTAL DECLARATION

(Doc. 4; Doc. 24)

25

Plaintiffs allege violations of their free speech rights under the First Amendment, arising

26

from Defendants' decision to ban their student organization's flyers from the College bulletin

27

boards. On August 11, 2022, Plaintiffs filed a motion for a preliminary injunction (Doc. 4) to

28

prevent enforcement of the College's policy regarding student flyers. After the parties fully

1

1    briefed the motion, the Court held a hearing on September 23, 2022. For the reasons set forth

2    below, Plaintiffs' motion for a preliminary injunction is **GRANTED**.

3    **I.   BACKGROUND**

4         Plaintiffs are students at Clovis Community College who founded the local chapter of the

5    student organization Young Americans for Freedom ("YAF"). (Doc. 5 at 9.) During the 2021-

6    2022 academic year, Plaintiffs posted or sought to post two sets of flyers on the student bulletin

7    boards in the College's Academic Center. (*Id.* at 10-13.) The first set, the "Freedom Week

8    Flyers," contained anti-leftist and anti-communist messages. (*Id.*) The second set included YAF's

9    "Pro Life Flyers." (*Id.*)

10        The State Center Community College District, a governing board for the College, set

11   general guidelines that outline the places on campus where students may post flyers and distribute

12   printed materials. (Doc. 13 at 3.) The AR 5550, the regulation issued by the SCCCD, explains

13   that "[s]tudents shall be provided with bulletin boards for use in posting student materials at

14   campus locations convenient for student use."[1] (Doc. 13-2 at 7-8.) Clovis Community College

15   created additional instructions concerning posters and flyers on the bulletin boards on its campus.

16   (Doc. 6-11 at 2.) The Flyer Policy reads,

17        CLOVIS COMMUNITY COLLEGE
18        Poster/Flyer Instructions:
         (Revised September 2018)

19        **Posting instructions**:

20        • Groups/individuals/clubs can post up to 25 posters.
21        • Posters are to be posted in appropriate indoor poster boards with 3-4 tacks (two
            at the top corners of the poster and one or town at the bottom).
22        • Posters can also be posted on permitted outside kiosks.
         • Posters should never overlap on another and should be posted at least two to
23          three finger lengths across.
         • Posters need to be in a straight and upright position.

24        **Posting Information**:

25        • All posters not bearing the Clovis Community Logo or in the provided Clovis
            Community College Template (i.e. posters not from a College Department or
26          Division) **must be approved and stamped by the Clovis Community College
            Student Center Staff**. Failure to do so will result in unapproved/unstamped

27

28   ---

     [1] Plaintiffs do not challenge AR 5550. (Doc. 21 at 4.)

flyers being removed and thrown away.
- Posters with inappropriate or offense language or themes are not permitted and will not be approved.
- Posters posted anywhere other than designated areas will be removed.
- Posters with unapproved (post approval) writing will be removed
- Damaged posters will be removed.

(Doc. 6-11 at 2 (emphasis in original).) At issue, is the Flyer Policy's requirement that students obtain preapproval to hang the posters and that material with "inappropriate or offense language or themes" may not be posted. (*Id.*)

In November 2021, Alejandro Flores submitted three Freedom Week Flyers to the College's Student Center Staff for approval. (Doc. 1 at 11, ¶¶ 58-60.) Defendant Stumpf approved them and permitted Mr. Flores to hang them on the bulletin boards in the Academic Center. (*Id.*) After several days on the bulletin boards, the Student Center Staff began receiving complaints that the flyers made people feel "uncomfortable." (Doc. 6-2 at 2.) College administrators, including Defendants Bennett, De La Garza, Hébert, and Stumpf, discussed how to proceed. In their email exchange, Stumpf highlighted the Flyer Policy's prohibition on "inappropriate or offense language or themes." (Doc. 6-4 at 2.) The college officials decided to permit the Freedom Week Flyers to remain on the bulletin boards until the end of Freedom Week and then had them removed. (Doc. 13-3 at 5-6.) Defendant Bennett proffered a justification; if the students should ask, tell them, "[the flyers] aren't club announcements." (Doc. 6-8 at 2.)

On December 1, 2021, in anticipation of the Supreme Court hearing oral arguments in *Dobbs v. Jackson Women's Health Organization*, Plaintiffs sought approval by the Student Center Staff to post their Pro-Life Flyers. (Doc. 1 at 14, ¶ 81.) Plaintiffs contend that Defendant Hébert disapproved of the flyers for the bulletin boards but permitted Plaintiffs to post the flyers on the "Free Speech Kiosk." (*Id.* at 15, ¶¶ 86-88.) Plaintiffs allege the Free Speech Kiosk is in a remote part of campus that gets little visibility by students. (*Id.* at 15, ¶ 89-94.) In his declaration, Mr. Hébert asserts he disapproved the first set of flyers because they "did not describe a school club or event." (Doc. 13-1 at 4-5, ¶¶ 10-14.) Mr. Hébert approved Plaintiffs second set Pro Life Flyers but did not explain how the second set differed from the first.

Plaintiffs challenge the provision of the College's Flyer Policy that proscribes

"inappropriate or offense language or themes." (Doc. 5 at 8-9.) Plaintiffs contend the policy, on its face, violates the First Amendment because restrictions on "inappropriate" or "offensive" is facially viewpoint discriminatory and incapable of reasoned application, regardless of the forum type. (*Id.*) Plaintiffs also contend this policy language is overbroad and vague, and the preapproval system acts as a prior restraint. (*Id.*) Additionally, Plaintiffs assert the Defendants applied the policy in a manner that discriminated on their political viewpoint.

Defendants respond that the bulletin boards do not constitute a public forum, and the school has "discretion not to promote or sponsor speech that might place it on one side of a controversial issue." (Doc. 13 at 5.) Defendants further argue that a preliminary injunction is inappropriate because no irreparable harm exists, given that both sets of YAF flyers were approved for the bulletin boards. (*Id.* at 7-9.) In addition, Defendants argue a preliminary injunction is futile because Plaintiffs failed to name indispensable parties in this action. (*Id.* 10.) Defendants did not respond directly to the arguments regarding prior restraint, overbreadth, and vagueness, but asked the Court to take judicial notice of the arguments they made in their motion to dismiss (Doc. 15), which they filed simultaneously with their opposition to the preliminary injunction. (Doc. 13-5.)

## II.   EVIDENTIARY ISSUES

### A.   Defendants' Request for Judicial Notice

With their opposition to the preliminary injunction, Defendants submitted a request for "judicial notice" of Plaintiffs' complaint and Defendants' filed motion to dismiss (Doc. 15). Plaintiffs opposed the request for judicial notice, in so far as Defendants asked the Court to take judicial notice of facts stated within the other documents. (Doc. 22.) Courts may generally take judicial notice of undisputed "matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). The existence of court filings on its own docket are typically undisputed matters. *Kelly v. Johnston*, 111 F.2d 613, 615 (9th Cir. 1940). However, facts contained within those filings which are subject to reasonable dispute do not qualify for judicial notice. Fed. R. Evid. 201; *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). Defendants' request does not clearly indicate whether they seek judicial notice merely for the existence of the

filings or also for the facts contained therein. Given Defendants' failure to identify which facts it believes might be undisputed or provide authorities to support such contentions, the Court only takes judicial notice of the existence of the Plaintiffs' complaint (Doc. 1) and Defendants' motion to dismiss (Doc. 15).

It is also unclear whether, through their judicial notice request, Defendants intended to incorporate by reference the arguments made in their motion to dismiss. Though their opposition contains only one direct reference to their motion to dismiss (*see* Doc. 13 at 6), during the hearing, Defendants referred the Court to their motion to dismiss arguments as substantive responses to Plaintiffs' claims regarding prior restraint, overbreadth, and vagueness. Generally, courts do not allow incorporation by reference of arguments or "substantive materials" not contained within the relevant motions' briefs. *Foley v. Graham*, 2022 WL 1714293, at *1 (9th Cir. May 27, 2022) ("We do not consider arguments incorporated by reference into the briefs."); *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996) ("[T]he reach of the 10(c) provision permitting the adoption by reference of material from pleadings cannot be extended by 7(b)(2) to include the adoption of *substantive material* in 'other papers.'") (emphasis in original); *Doc's Dream, LLC v. Dolores Press, Inc.*, 2018 WL 11311292, at *1 (C.D. Cal. Mar. 1, 2018), aff'd, 766 F. App'x 467 (9th Cir. 2019) ("[T]he Court admonishes Plaintiff for blurring the procedural lines between the motions by "incorporat[ing] ... by reference *in extenso*" its arguments in support of its own motion in its opposition papers."); *McCracken v. Thor Motor Coach Inc.*, 2015 WL 13566918, at *2 (D. Ariz. Dec. 3, 2015) ("Courts 'are not like pigs, hunting for truffles buried in briefs,' ... and it would not be fair to require opposing counsel to engage in hunting expeditions either. Incorporating prior arguments by reference in motion papers is generally ignored by the Court." (quoting *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)).

Though incorporation of Defendants' motion to dismiss arguments is typically impermissible because Defendants provided little to no response to three of Plaintiffs' primary claims, the Court has reviewed Defendants' arguments in the motion to dismiss as they relate to prior restraint, overbreadth, and vagueness solely to evaluate the true likelihood of success of

1    Plaintiffs' claims. Even if the Court were to consider these arguments as properly opposing the

2    preliminary injunction, however, Defendants' arguments would not change the outcome, as

3    discussed in corresponding sections below.

4    **B.      Plaintiffs' Motion to File Late Declaration**

5           On September 21, 2022, two days prior to the preliminary injunction hearing, Plaintiffs

6    filed a motion for leave to file a supplemental declaration, which contains information about

7    alleged ongoing actual irreparable harm. (Doc. 24.) Plaintiffs' supplemental declaration comes

8    approximately a week after filing their reply brief, the deadline for which had already been

9    extended twice, and more than a month after their initial motion. (*See* Docs. 12, 20.) Defendants

10   filed an objection to Plaintiffs' late-submitted evidence, arguing Defendants did not have an

11   adequate opportunity to respond. (Doc. 27.) For the reasons discussed below addressing the

12   parties' arguments about the irreparable harm factor, the Court need not resolve whether actual

13   irreparable harm exists to grant the preliminary injunction, rendering Plaintiffs' supplemental

14   declaration unnecessary at this stage. To avoid potential unfairness to Defendants or the need for

15   additional briefing, Court will not consider Plaintiffs' newly presented evidence, and their motion

16   for leave to file the declaration is **DENIED**. Nothing precludes Plaintiffs from re-filing this

17   evidence subsequently during the litigation should it become necessary and is submitted

18   according to proper procedures.

19                      **III.      LEGAL STANDARDS FOR PRELIMINARY INJUNCTIONS**

20          "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

21   *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). "A plaintiff seeking a

22   preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

23   suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

24   favor, and that an injunction is in the public interest." *Id.* at 20. In the Ninth Circuit, courts

25   evaluate these factors "on a sliding scale, such 'that a stronger showing of one element may offset

26   a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th

27   Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

28          A preliminary injunction may only be awarded "upon a clear showing" of evidence that

1   supports each relevant preliminary injunction factor. *Winter*, 555 U.S. at 22. "This 'clear

2   showing' requires factual support beyond the allegations of the complaint, but the evidence need

3   not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*,

4   2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distributing Co., Inc. v.

5   Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). While "a plaintiff may not support a motion for a

6   preliminary injunction by merely pointing to his complaint and the facts alleged therein,"

7   *Shaterian v. Wells Fargo Bank. Nat. Ass'n*, 2011 WL 2314151, at *4 (N.D. Cal. June 10, 2011), a

8   "verified complaint ... may afford the basis for a preliminary injunction." *K-2 Ski Co. v. Head Ski

9   Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972).

## IV.   ANALYSIS

### A.   Likelihood of Success on the Merits

Plaintiffs assert several constitutional challenges to the Flyer Policy, both facially and as applied. The Court addresses each in turn.

#### 1.   Facially Viewpoint Discriminatory and Incapable of Reasoned Application

Plaintiffs claim the College's Flyer Policy facially discriminates based on viewpoint and is incapable of reasoned application because it bans "inappropriate" or "offens[ive]" speech. (Doc. 5 at 16-20.) Plaintiffs contend that regardless of whether the bulletin boards in the Academic Center constitute a public forum or a nonpublic forum, the College cannot impose viewpoint discriminatory policies on student speech. (*Id.* at 17.) In response, Defendants argue that the SCCCD's AR 5550 regulation designated the bulletin boards as a nonpublic forum and the College has editorial discretion over the content of its bulletin boards because the messages "could be associated with the school."[2] (Doc. 13 at 5-7.)

##### a.   *Forum Analysis*

As a preliminary matter, the Court addresses the parties' dispute regarding which type of forum the bulletin boards are and whether this impacts the type of restrictions the College may

---

[2] Defendants also argue that the College had "the right to control any messages" on the bulletin boards because the Flyer Policy "unmistakably reserved" this right." (Doc. 13 at 6.) This argument is circular; a government entity cannot avoid constitutional requirements merely by declaring it can do so.

impose. Traditionally, restrictions on free speech are evaluated under the forum analysis, which categorizes types of government-controlled spaces. The Supreme Court recognizes three types of forums: traditional public forums, designated public forums, and nonpublic forums. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). "In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). Designated public forums consist of spaces not traditionally regarded as "public" but which the government has "intentionally opened up for that purpose." *Pleasant Gove*, 555 U.S. at 469-70. The same standards for speech restrictions apply in both public and designated public forums. *Mansky*, 138 S. Ct. at 1885. However, in a nonpublic forum[3]—"a space that 'is not by tradition or designation a forum for public communication'—the government has much more flexibility to craft rules limiting speech." *Id.* (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983). In addition to the time, place and manner restrictions permitted in public forums, the government may also impose content-based limitations in nonpublic forums, "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Accordingly, the government's "right to exercise control" over its facilities does not allow it to exclude or prohibit speech "solely to suppress the point of view [the speaker] espouses on an otherwise includible subject," *regardless* of the forum type. *Id.*; *see also Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 189 (2007).

Because the First Amendment prohibits viewpoint discrimination under all three forum types and the College undisputedly opens the bulletin boards to third-party speakers, the Court need not determine whether the bulletin boards in the Academic Center are public or nonpublic forums. A school district "may legally preserve the property under its control for the use to which

---

[3] The terms "nonpublic forum" and "limited public forum" are often used interchangeably because the same reasonableness test and prohibition against viewpoint discrimination equally applies. *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007); *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 n.4 (9th Cir. 2019) ("'Limited public forums' have also been referred to as 'nonpublic forums' interchangeably.")

it is dedicated," but once it opens a governmental space to non-governmental speakers, that control does not permit viewpoint-based restrictions. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390-93 (1993); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). It is undisputed that the College permits students, i.e., non-governmental speakers, to post messages and flyers containing student speech on the bulletin boards in the Academic Center. (*See* Doc. 6-11 at 2 (College Flyer Policy permitting "Groups/individuals/clubs can post up to 25 posters); *see also* Doc. 13-2 at 8 (AR 5550 proscribing "Student shall be provided with bulletin boards for use in posting *student materials* convenient for *student* use." (emphasis added)).) Contrary to Defendants' assertion, because the bulletin boards constitute, at a minimum, a nonpublic forum, the College does not have limitless discretion to determine what student messages are permitted. *See Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1214-15 (9th Cir. 1996) (applying the standards of nonpublic forums to a state agency's walls and bulletin boards open to agency employees to post messages). Thus, regardless of whether the bulletin boards are a public or nonpublic forum, the prohibition against viewpoint discrimination equally applies. Because Plaintiffs' challenges to the Flyer Policy depend on viewpoint discrimination, the Court need not determine the precise forum of the bulletin boards.

### b. *Government Speech Defense*

For similar reasons, any argument that the student flyers constitute government speech also fails. Though Defendants' opposition did not expressly raise this defense, Plaintiffs construed Defendants' arguments in this manner. (*See* Doc. 21 at 8-9.) Defendants' arguments seemingly relate more closely to the school-sponsored speech doctrine, as discussed below, *infra* Section IV(A)(1)(c); however, out of an abundance of caution, the Court briefly addresses why the government speech defense does not apply.

The government speech doctrine permits viewpoint discrimination when the "government speaks for itself." *Shurtleff v. Boston*, 142 S. Ct. 1583, 1587 (2022); *see also Pleasant Grove*, 555 U.S. at 472-73 (holding monuments in a city park constitute government speech and therefore,

not subject to regulation by the Free Speech clause because the city selected the monuments for the purpose of presenting "the image of the City that it wishes to project"). "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff*, 142 S. Ct. at 1589. The court considers several factors to determine if certain speech constitutes government rather than private speech, including: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-90. (holding Boston's policies regarding raising flags outside city hall were not government speech because, although flags have historical connection to representing government messages, Boston allowed private groups to raise and lower flags and permitted fifty different flags, some of which conveyed messages with no connection to city-approved values and the city did not have "meaningful involvement" in selection of flags).

In *Downs v. Los Angeles Unified School District*, the Ninth Circuit evaluated the applicability of government speech within the school context. 228 F.3d 1003, 1011-12 (9th Cir. 2000). In *Downs*, a high school teacher created a bulletin board, placed it on the school walls, and posted his own flyers on it. *Id.* at 1006. The teacher's flyers contained messages to compete with the school's bulletin boards, which the school had created for the purpose of recognizing Gay and Lesbian Awareness month. *Id.* The Ninth Circuit held the teacher's flyers constituted government speech because he acted as an employee for the school, only school faculty and staff had access to the bulletin boards, and the principals of the high school retained oversight over the posted content "at all times." *Id.* at 1010-11. The school board had issued a memorandum, pursuant to which the high school set up the Gay and Lesbian Awareness bulletin boards "as an expressive vehicle" of the policy of "Educating for Diversity." *Id.* at 1012. Thus, the school principals had final authority over the content of all bulletin boards, rendering "all speech that occurred on the bulletin boards" that of the school. *Id.* For contrast, the Ninth Circuit compared student-written articles in a school-sponsored newspaper or an outside organization's advertisements in school-sponsored student newspapers, yearbooks, and athletic programs which is not government speech.

1   *Id.*

2         Student flyers on the College's bulletin boards do not equate to government speech.

3   Though the College's Flyer Policy provides some guidelines related to the content permitted, i.e.,

4   prohibiting inappropriate or offensive speech, the Policy does not promote or seek to express a

5   specific message or theme on its bulletin boards. The Policy's lack of specific message, or even a

6   range of topics that may be appropriate, contrasts the school's memorandum in *Downs* which

7   designated the bulletin boards for promoting diversity and limited messages to that topic. On the

8   one hand, the Flyer Policy's preapproval process, requiring the College's permission and stamp of

9   approval before students may hang their flyers, arguably grants the College some discretion over

10   the content. However, the requirement for the flyers to clearly display the name of the student

11   author contradicts any impression that the flyers portray the College's own message. (*See* Doc.

12   13-2 at 8 ("All materials displayed on a bulletin board shall clearly indicate the author or agency

13   responsible for its production."); Doc. 6-11 at 2.) Finally, the AR 5550 defines the purpose of the

14   bulletin boards as for "student material" and for "student use," clarifying that these messages

15   should not be construed as that of the College. (Doc. 13-2 at 8.) The totality of these factors

16   indicates the student messages on bulletin boards do not constitute government speech. *See*

17   *Rosenberger*, 515 U.S. at 834-35 (holding the university's decision whether to expend funds on a

18   student organization's newspaper is not the university itself speaking because the university

19   declared student groups that they support with funding "are not University's agents, not subject to

20   its control, and are not its responsibility").

21                  c.   *School-Sponsored Speech Doctrine on College Campus*

22         Although the student flyers affixed to the bulletin boards are not vehicles for government

23   speech, the question remains whether they implicate a school-sponsored message. In the primary

24   and secondary school context, the school-sponsored speech doctrine recognizes that the school

25   may have a heightened interest in regulating third-party speech when the public may reasonably

26   perceive it as sponsored or endorsed by the school, such that it bears the imprimatur of the school.

27   *See Hazelwood Sch. Dist. v. Kulmeier*, 484 U.S. 260, 270-73 (1988). The Supreme Court

28   distinguished between speech that the school must *tolerate* versus what it must affirmatively

1   *promote* under the First Amendment. *Id.* at 270-71. The Court recognized that schools have a

2   legitimate interest in ensuring that school-promoted speech—such as school publications or

3   theatrical productions—is not inconsistent with its "basic educational mission." *Id.* at 266 (citing

4   *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)). In the context of high

5   schools that regulate school-sponsored expressive activities, educators may exercise "editorial

6   control over the style and content of student speech . . . so long as their actions are reasonably

7   related to legitimate pedagogical concerns." *Id.* at 273. For instance, the Supreme Court

8   recognized legitimate pedagogical concerns in the high school's need to disassociate itself from

9   "any position other than neutrality on matters of political controversy." *Id.* at 272. The Supreme

10   Court declined, however, to decide whether the school-sponsored speech doctrine applies to

11   public colleges or universities. *Hazelwood*, 484 U.S. at 273 n.7. The current status of the

12   applicability of school-sponsored speech on college campuses remains unclear.[4]

13          Traditionally for purposes of higher education, the Supreme Court has analogized the

14   extent of free speech rights on campus to that of the adult community, not the K-12 school

15   setting. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room

16   for the view that . . . First Amendment protections should apply with less force on college

17   campuses than the community at large."); *see also Papish v. Bd. Of Curators of Univ. of*

18   *Missouri*, 410 U.S. 667, 671 (1973) ("[T]he First Amendment leaves no room for the operation of

19   a dual standard in the academic community with respect to the content of speech."). The

20   university setting provides a "marketplace of ideas'' (*Healy*, 408 U.S. at 180), in which students

21   learn the "background and tradition of thought and experiment that is at the center of our

22   intellectual and philosophical tradition." *Rosenberger*, 515 U.S. at 835-36. A central purpose of the

23

24   [4] The Circuits appear split on this issue and the Court has not found, nor have the parties cited, controlling Ninth
      Circuit precedent to resolve the split. *See, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004);
25   *Student Gov't Ass'n v. Bd. Of Trs. of the Univ. of Mass.*, 868 F.2d 473, 480 n.6 (1st Cir. 1989). In 2015, the Ninth
      Circuit considered the question within the context of a graduate program where certain student speech conflicted with
26   the ethical standards governing the profession in which the student sought certification. *Oyama v. Univ. of Haw.*, 813
      F.3d 850, 854-55 (9th Cir. 2015) In *Oyama*, the Ninth Circuit relied on certain principles that form the basis of the
27   school-sponsored speech doctrine in reaching its decision but explicitly declined to decide whether *Hazelwood* has
      applicability in the university setting. *Id.* at 861-63. For example, the "imprimatur" concept was relevant not because
28   the certification would be erroneously attributed to the school, but because professional certification essentially
      "forces the university to speak." *Id.* at 862.

12

1  university system is to foster creative inquiry, which develops through the expression of a

2  diversity of viewpoints. *Id.*

3      Given these considerations, content-based restrictions to student speech on campus

4  typically require "the most exacting scrutiny." *Widmar v. Vincent*, 454 U.S. 263, 274-76 (1981)

5  (holding university's decision to prohibit a religious student group from using school facilities

6  unconstitutional because, in part, "an open forum in a public university does not confer any

7  imprimatur of state approval on religious sects or practices," thereby decreasing the university's

8  interest in content-based regulation). For example, in *Rosenberger*, the Supreme Court held the

9  university's decision to deny funding to a religious student group unconstitutional because the

10 denial arose from viewpoint discrimination against the religious content. *Rosenberger*, 515 U.S.

11 at 837. By making funding generally available for student organizations, the university created a

12 metaphorical limited public forum and therefore, could not "discriminate against speech on the

13 basis of its viewpoint." *Id.* at 829-30. In dicta, however, the Court explained that its holding did

14 not limit the college from imposing viewpoint-based regulations when the university speaks for

15 itself or "subsidize[s] transmittal of a message it favors." *Id.* at 834. But the university may not

16 engage in viewpoint discrimination when it "expends funds to encourage a diversity of views

17 from private speakers." *Id.*; (citing *Hazelwood*, 484 U.S. at 270-72) ("A holding that the

18 University may not discriminate based on the viewpoint of private person whose speech it

19 facilitates does not restrict the University's own speech, which is controlled by different

20 principles."). While clearly carving out an exception for government speech, the Supreme Court's

21 guidance suggests content or viewpoint restrictions *may* be permissible for student speech that

22 bears the imprimatur of the university.

23      On the one hand, the traditional standard for free speech on campus and the colleges'

24 educational purpose to promote a diversity of viewpoints indicates that the typical *Hazelwood*

25 school-sponsored speech doctrine does not directly apply because the different levels of education

26 have different missions and responsibilities towards their students. On the other hand,

27 *Rosenberger* suggests that some form of the *Hazelwood* standards may apply on college

28 campuses to preserve the government interest in preventing the public from incorrectly attributing

certain viewpoints to those of the college. The parties have not cited, and the Court has not found case law which definitively resolves the question whether, and the extent to which the school-sponsored speech doctrine established by *Hazelwood* applies in the campus setting.[5] However, the contours of the current case law, even without a definitive resolution, impact Plaintiffs' constitutional challenges to the Flyer Policy.

> d.   *"Inappropriate" or "Offensive" as Facially Viewpoint Discriminatory*

Given these principals for evaluating students' free speech rights on campus, the Court turns to Plaintiffs' constitutional challenge which contends the Flyer Policy discriminates based upon viewpoint by banning "inappropriate or offens[ive]" language. (Doc. 5 at 18.) Plaintiffs argue that any decision regarding whether speech is offensive or inappropriate is itself a viewpoint determination. (*Id.*) Plaintiffs rely primarily on two cases that have held speech restrictions on "offensive" or "disparaging" speech discriminates based on viewpoint. *Id.*; *see Matal v. Tam*, 137 S. Ct. 1744, 1751, 1763 (2017) (holding the Lanham Act's prohibition on trademarks that "disparage" impermissibly grants the U.S. Patent and Trademark Office the ability to disapprove of "ideas that offend" and "[g]iving offense is a viewpoint"); *see also Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1130-32 (9th Cir. 2018) (holding unconstitutional the county's ban on advertising for its metro system that contains "material that demeans or disparages" because limitations on "offensive speech" invite facial viewpoint discrimination). *Matal* and *American Freedom* confirm that government regulations containing prohibitions on "offensive" speech are facially viewpoint discriminatory because the determination of what "offends" depends on the government's viewpoint. *Matal* and *American Freedom*, however, dealt with adult speech outside of the college or university context.

Plaintiff also points to *Papish v. Board of Curators of the University of Missouri* to allegedly show an extension of *Matal* and *American Freedom* to student speech on campus. (Doc. 5 at 18-19.) In *Papish*, the Supreme Court held the university's disciplinary action against a

---

[5] Defendants rely on *Planned Parenthood v. Clark County School District*, 941 F.2d 817 (9th 1991). (Doc. 13 at 5-6.) However, *Planned Parenthood* addressed a high school's prohibition of Planned Parenthood advertisements in the school yearbook, falling squarely in the *Hazelwood* doctrine but providing little guidance for the campus context. *Planned Parenthood*, 941 F.2d at 822-24.

graduate student, who distributed a newspaper on campus containing a sexually explicit and profane political cartoon, violated her free speech rights. *Papish*, 410 U.S. at 667-69. The university prohibited the student's cartoon because it was "obscene" and expelled her for distributing it. *Id.* The Supreme Court concluded that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions' of decency.'" *Id.* at 670. *Papish* seemingly suggests the prohibition of "offensive" speech for inviting viewpoint discrimination applies equally on and off campus. However, *Papish* pre-dates the *Hazelwood* school-sponsored speech doctrine, and the newspaper distributed in *Papish* was privately funded, not a school newspaper or published with school funding. *See Papish v. Bd. of Curators of Univ. of Mo.*, 331 F. Supp. 1321, 1325 (W.D. Mo. 1971). Thus, *Papish* did not consider the university's potential interest in limiting school-sponsored speech and does not provide controlling authority for whether the outright prohibition against regulations on "offensive" speech, arising under *Matal* and *American Freedom*, equally applies in the college context.

Contrasting *Papish*, in *Fraser*, the Supreme Court permitted a high school to impose discipline on a student for his "offensively lewd and indecent speech." *Fraser*, 478 U.S. at 685. The student's speech at the high school assembly contained "pervasive sexual innuendo" that was "plainly offensive to both teachers and students—indeed to any mature person." *Id.* at 683. The Supreme Court reasoned that while adults may freely engage in "highly offensive" speech, the school board had discretion to determine what speech is inappropriate for the school assembly, in light of the school's need to guard a "less mature audience." *Id.* at 682, 687.

The Supreme Court's reasoning in *Fraser* highlights a distinction between schools that oversee younger student bodies and colleges that foster learning in adults. College administrators do not have the responsibility to act *in locos parentis* for their students or to shield them from "sexually explicit, indecent, or lewd speech," as K-12 administrators do. *See Fraser*, 478 U.S. 684. This distinction *suggests* that the College's interest in prohibiting "offensive" speech, under the Flyer Policy, does not correlate to the concerns of primary and secondary schools, as outlined in *Fraser*. However, this distinction in the school's interest does not necessarily extend to

1   circumstances of school-sponsored political speech, where a college *may* have certain

2   pedagogical concerns such that it *could* regulate based on viewpoint to avoid associating itself

3   with one side of a controversial issue. Thus, neither *Fraser* nor *Papish* contain the relevant

4   standards to evaluate a college policy that bans "offensive" speech on its own walls.

5            Given the uncertainty as to the applicability of the school-sponsored speech doctrine to the

6   college context and its potential impact on facially viewpoint discriminatory policies, the Court is

7   hesitant to rely solely on the precedents of *Matal* and *American Freedom* to evaluate the College'

8   Flyer Policy.[6] However, the contours of the school-sponsored speech doctrine and the authorities

9   involving college student speech inform the Court's analysis regarding overbreadth and

10  vagueness. Given that the Court finds the Flyer Policy overbroad and vague as discussed below, it

11  need not issue a final determination on Plaintiffs' viewpoint discriminatory facial challenge.[7]

12           2.   Overbreadth

13           Plaintiffs argue the Flyer Policy's restriction on "inappropriate or offense language or

14  themes" is facially overbroad because a substantial number of the policy's applications prohibit

15  constitutionally protected speech. (Doc. 5 at 20-21.) The overbreadth doctrine "exits out of

16  concern that the threat of enforcement of an overbroad law may deter or chill constitutionally

17  protected speech." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d

18  936, 944 (9th Cir. 2011) (quotations omitted). Under the overbreadth doctrine, litigants may

19  "challenge a statute not because their own rights of free expression are violated, but because of a

20  judicial prediction or assumption that the statute's very existence may cause others not before the

21  court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*,

22  413 U.S. 601, 612 (1972). However, facial overbreadth should be applied sparingly, and courts

23

24  _____

[6] Even if the *Hazelwood* doctrine applies to the college context, it is further unclear whether the public would
25  reasonably perceive the College's bulletin boards in the Academic Center as "school-sponsored." Though Defendants
argue the messages on the bulletin board "could be associated with the school," they provided no support for this
26  contention. (Doc. 13 at 6-7.) Plaintiffs' briefs also lack directly applicable authority.
[7] Within this constitutional challenge, Plaintiffs also contend the "inappropriate or offense" ban is incapable of
27  reasoned application because it lacks objective, workable standards. (Doc. 5 at 19-20.) Plaintiffs' argument stems
from an application of the scrutiny used in non-public or limited public forums. *Id.*; *see e.g.*, *Mansky*, 138 S.Ct. at
28  1888-91. Given the complexity of the forum analysis in college campuses when the school-sponsored doctrine is
implicated, as outlined above, the Court likewise declines to rule on this issue.

1  often impose a limiting construction, rather than striking the whole statute, where possible.

2  *United States v. Stansell*, 847 F.2d 609, 612-13 (9th Cir. 1988).

3    "[T]he overbreadth of a statue must not only be real, but *substantial* as well, judged in

4  relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. Substantial

5  overbreadth exists "if a substantial number of its applications are unconstitutional, judged in

6  relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473

7  (2010) (quotations omitted). To make this determination, the Court must first evaluate "whether

8  the enactment reaches a substantial amount of constitutionally protected conduct." *Bauer v.*

9  *Sampson*, 261 F.3d 775, 782 (9th Cir. 2001) (quoting *Vill. of Hoffman Estates v. Flipside,*

10  *Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). If there is "no core of easily identifiable and

11  constitutionally proscribable conduct" covered by the policy, it is unconstitutional. *Sec'y of State*

12  *of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966 (1984); *see also United States v. Stansell*,

13  847 F.2d 609, 613 (9th Cir. 1988). When the government imposes a direct restriction on speech,

14  the law is unconstitutionally overbroad where "the means chosen to accomplish the State's

15  objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk

16  of chilling free speech." *Munson*, 467 U.S. at 967-68. To determine the scope of the law's

17  unconstitutional applications, the party challenging the law need not introduce admissible

18  evidence of overbreadth but must at least "describe the instances of arguable overbreadth of the

19  contested law." *Comite de Jornaleros*, 657 F.3d at 944 (quotations omitted).

20      a. *Plainly Legitimate Sweep*

21    Turning first to whether the Flyer Policy has a "plainly legitimate sweep," the prohibition

22  on "inappropriate or offense language or themes" does not have a core of readily identifiable,

23  constitutionally proscribable speech. The Supreme Court has established that the government may

24  not proscribe speech merely because it offends someone or because it contains an unpopular

25  viewpoint. *See, e.g.*, *Papish*, 410 U.S. at 670; *Tinker v. Des Moines Indep. Cnty. Sch. Dist.*, 393

26  U.S. 503, 509 (1969) (stating that "mere desire to avoid the discomfort and unpleasantness that

27  always accompany an unpopular viewpoint" is insufficient to justify prohibition of a particular

28  expression of opinion). Given this irrefutable principle, other courts have found university

1   policies with similar language have no legitimate sweep of constitutionally proscribable speech.

2   *See McCauley v. Univ. of V.I.*, 618 F.3d 232, 248-50 (3rd Cir. 2010) (holding the university's

3   policy permitting punishment of "offensive" or "unauthorized" signs overbroad because

4   "offensive is, on its face, sufficiently broad and subjective that [it] could conceivably be applied

5   to cover any speech ... th[at] offends someone") (quotations omitted); *see also Coll. Republicans*

6   *at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1018-19 (N.D. Cal. 2007) (finding a

7   university's requirement that students be "civil to one another" had a likelihood of being

8   substantially overbroad).

9          Defendants offer little response to Plaintiffs' overbreadth challenge. In their motion to

10   dismiss, Defendants argue Plaintiffs could post their flyers on the Free Speech Kiosks, thus

11   supposedly eliminating any constitutional harm caused by the restrictions on speech on the

12   bulletin boards. (Doc. 15 at 26.) Defendants have not cited, and the Court has not found any

13   authority that suggests, the availability of alternative channels of communication justifies content-

14   based restrictions on speech. Rather, the concept of alternative communication channels pertains

15   to the validity of time, place, and manner restrictions. Valid time, place, and manner restrictions

16   must *exclude* content-based limitations and *include* ample alternative communication channels:

17        [I]n a public forum the government may impose reasonable restrictions on the time,
          place, or manner of protected speech, *provided the restrictions are justified without*
18        *reference to the content of the regulated speech*, that they are narrowly tailored to
          serve a significant governmental interest, *and* that they leave open ample alternative
19        channels for communication of the information."

20   *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added, citations omitted).

21          Content-neutrality serves as a threshold question before considering the existence of

22   alternative channels. "If the ordinance is content-neutral, we must determine whether it is

23   narrowly tailored, serves a significant government interest, and leaves open ample alternative

24   channels of expression." *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir.

25   2006). However, a content-based restriction is "presumptively invalid" and upheld only if "it is

26   the least restrictive means of furthering a compelling government interest." *Id.*; *see also Berger v.*

27   *City of Seattle*, 569 F.3d 1029, 1050-52 (9th Cir. 2009) (applying strict scrutiny to a content-

28   based restriction, which considers whether the rule uses the "least restrictive manner possible" to

18

1    serve a compelling government interest, rather than content-neutral restrictions which consider if

2    "reasonable alternative channels for expression" exist). Courts typically only consider the

3    reasonableness of alternative channels for communication *after* first concluding the challenged

4    regulation does not discriminate based on content. *See One World One Fam. Now v. City & Cnty.*

5    *of Honolulu*, 76 F.3d 1009, 1012-14 (9th Cir. 1996) (considering the sufficiency of alternative

6    channels only after concluding the city ordinance did not arise from a content-based justification);

7    *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1128-29, 1138 (9th Cir. 2005) (same).

8           Defendants' own proffered justification for determining allowable flyers on the bulletin

9    boards invokes a question of their content, i.e., whether they are of interest to the students. (Doc.

10    13 at 7); *See One World One Fam*, 76 F.3d at 1012 (citing *Clark v. Community for Creative Non-*

11    *Violence*, 468 U.S. 288, 293 (1984)) ("A speech restriction is content-neutral if it is 'justified

12    without reference to the content of the regulated speech.'"). Moreover, the policy itself "describes

13    speech by content" by prohibiting offensive and inappropriate speech. *See City of Los Angeles v.*

14    *Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring). Because the Flyer

15    Policy clearly contains content-based limitations to student speech, the availability of the Free

16    Speech Kiosks has no bearing on Plaintiffs' content-based and viewpoint-based challenges,

17    including their challenge to the Policy's overbreadth. *See Menotti*, 409 F.3d at 1128 (determining

18    whether the restrictions were "were content neutral, were narrowly tailored to serve a significant

19    governmental interest, and left open ample alternative means of communication" to evaluate the

20    overbreadth challenge).[8]

21           Defendants also argue, without any authoritative support, that Plaintiffs "did not have any

22    First Amendment rights in connection with postings on College Bulletin Boards." As previously

23    explained, once Defendants opened the bulletin boards to non-government speech, they do not

24    have unbridled editorial discretion over the content of the student flyers. Defendants also contend

25

26    [8] Even if the availability of alternative forums impacted these constitutional challenges, Plaintiffs submitted evidence
to show the Free Speech Kiosk is not an adequate alternative. Plaintiffs allege the Free Speech Kiosk is "a small box

27    located in a remote part of campus Clovis students seldom, if ever, visit." (Doc. 5 at 13.); *see also Lone Star Sec. &*
*Video, Inc., v. City of Los Angeles*, 989 F. Supp. 2d 981, 992 (9th Cir. 2013) ("[A]lternatives are not adequate if they

28    do not allow the speaker to reach her intended audience, the location is part of the expressive message, or there are
not opportunities for spontaneity."). Defendants did not dispute this fact.

1   they may impose "time, place, and manner restrictions to prevent the College from being forced

2   to adopt any positions that are posted on it [sic] interior walls." (Doc. 15 at 26.) Plaintiffs do not

3   challenge the Flyer Policy based on any time, place, or manner restriction, because time, place,

4   and manner restrictions do not include any content-based or viewpoint-based determinations.[9]

5   Defendants' contention, therefore, is nonresponsive to the challenged provisions.

6                            b.   *Substantial Reach to Constitutionally Protected Speech*

7            Even assuming the Flyer Policy has some legitimate sweep, Plaintiffs demonstrated a

8   likelihood that the Flyer Policy impermissibly reaches a substantial number of applications of

9   constitutionally protected speech. For example, Plaintiffs posit that College administrators could

10  enforce the "inappropriate or offense" provision to block student flyers stating "Blue Lives

11  Matter" or "Black Lives Matter" or prohibit student messages concerning marriage rights. (Doc. 5

12  at 21.) The First Amendment "affords the broadest protection" to political expression. *McIntyre v.*

13  *Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). Moreover, the terms "inappropriate" or

14  "offensive" may apply to speech containing profanity or graphic commentary, which the Supreme

15  Court has shielded under First Amendment protections. *See Papish*, 410 U.S. at 668-71 (holding

16  the university could not discipline a graduate student for a political comic with graphic profanity

17  in a newspaper sold on campus because it was "indecent"). In fact, the Supreme Court explicitly

18  prohibited restrictions on the "dissemination of ideas—no matter how *offensive* to good taste—on

19  a state university campus. . . in the name alone of 'conventions of decency.'" *Id.* at 670 (emphasis

20  added).

21          Plaintiffs also put forth credible arguments that *all* applications of the Flyer Policy

22  provision are unconstitutional. (Doc. 5 at 16-20.) As discussed above with respect to the

23

24  ─────────────────────
    [9] Throughout Defendants' opposition to the preliminary injunction and the motion to dismiss, they seemingly
25  conflate the types of free speech regulations permitted in each forum. For example, reasonable "time, place, and
    manner restrictions" are allowed in any forum *so long as* they are content-neutral, narrowly tailored to serve a
26  compelling governmental interest, and leave open ample alternative means of communication. *See Edwards v. City of
    Coeur d'Alene*, 262 F.3d 856, 862 (9th Cir. 2001). Even when the government may impose content-based
27  restrictions, the restrictions cannot include restraints based on viewpoint. *Norse v. City of Santa Cruz*, 629 F.3d 966,
    975 (9th Cir. 2010). To the extent Defendants attempt to argue they may impose viewpoint-based restrictions because
28  the bulletin boards bear the imprimatur of the College, they have not cited any authority that suggests a broad
    restriction on offensive speech reasonably relates to a legitimate pedagogical concern, as required under *Hazelwood*.

viewpoint discriminatory challenge, outside of the school context, regulations banning "offensive" or "disparaging" language invite viewpoint discrimination on their face. *See Matal*, 137 S. Ct. at 1751; *see also Am. Freedom Def. Initiative*, 904 F.3d at 1128. Though the implications of the school-sponsored speech doctrine to college campuses are unsettled, the general tenor of cases involving restrictions on college student speech strongly suggest that a ban on "offensive" speech undermines the school's own interest in fostering a diversity of viewpoints on campus, thus frustrating, rather than promoting, the College's basic educational mission. *See Healy*, 408 U.S. at 180-81 ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom."); *see also Oyama*, 813 F.3d at 861 ("In the twenty-seven years since *Hazelwood*, we too have declined to apply its deferential standard in the university setting."). Though the Court need not definitively decide whether the Flyer Policy is facially unconstitutional for inviting viewpoint discrimination at this stage, these authorities further demonstrate the overbreadth of the statute by illustrating the unconstitutional reach of the Flyer Policy.

Even assuming the school-sponsored speech doctrine applies and permits the College some editorial discretion over the bulletin boards, the College's restrictions still must be "reasonably related to legitimate pedagogical concerns." None of the cases, even in the K-12 context, have allowed schools to broadly exclude all "offensive" conduct. In *Fraser*, for example, the student speech was not merely offensive, but also "sexually explicit, indecent, or lewd." *Fraser*, 478 U.S. 684. Moreover, in *Hazelwood*, the Supreme Court recognized legitimate pedagogical concerns in a high school's need to disassociate itself from "any position other than neutrality on matters of political controversy." *Hazelwood*, 484 U.S. at 271-72 (also acknowledging an interest to disassociate itself from "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences"). Colleges may also have a legitimate interest in prohibiting disruptive speech. *Tinker*, 393 U.S. 509.

The Flyer Policy's broad ban reaches well beyond these more narrowly defined types of

inappropriate speech because it fails to identify a category of offensive speech that may reasonably relate to its pedagogical concerns. Though Defendants argue that "if the Plaintiff were to succeed and there was no limitation on speech from the policy it could allow for all forms of posting including: hate speech, speech inciting violence, and racism that are not associated with any college club or student group" (Doc. 13 at 9), they fail to explain why a more narrowly tailored policy could not address unprotected speech while allowing protected speech.[10]

In light of the evidence illustrating the extensive amount of protected speech encompassed by the "inappropriate or offense" provision, the Flyer Policy's unconstitutional applications substantially outweighs the College's alleged legitimate objectives. Defendants contend the College uses the Flyer Policy's preapproval process to ensure postings relate to "groups, events, and services that may interest students." (Doc. 13 at 7.) A prohibition against all "offensive" and "inappropriate" speech is not a precise means to accomplish this goal. Whether a message contains offensive or inappropriate language does not directly relate to whether students have interest in the message. The Flyer Policy's combination of the preapproval system and broadly defined ban on offensive speech likely creates a chilling effect on student speech and an "unacceptable risk of the suppression of ideas" otherwise protected by the First Amendment. *Virginia v. Black*, 538 U.S. 343, 365 (2003) (holding a prohibition on cross burning as impermissibly overbroad because, without requiring evidence of an intent to intimidate, the prohibition may prevent the expressive conduct of "cross burning itself"); *see also Berger*, 569 F.3d at 1037 ("A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality.") (quotations omitted). Accordingly, the Court finds Plaintiffs demonstrated a likelihood of success on the merits of their claim that the Flyer Policy's "inappropriate or offense language or themes" provision is unconstitutionally overbroad.

    3.  <u>Vagueness</u>

Plaintiffs challenge the Flyer Policy as unconstitutionally vague. (Doc. 5 at 21-24.) "A

---

[10] Plaintiffs argue Defendants' failure to address this issue and the vagueness argument constitutes waiver. (Doc. 21 at 6-7.) Although the Court, in its discretion, declines to find the arguments waived, it acknowledges that a lack of directly opposing argument suggests a likelihood of success on the merits of these claims.

1    fundamental requirement of due process is that a statute must clearly delineate the conduct it

2    proscribes." *Kev, Inc. v. Kitsap Cnty.*, 793 F.2d 1053, 1057 (9th Cir. 1986). Laws containing

3    terms with uncertain meanings may lead individuals to "steer far wider of the unlawful zone than

4    if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360,

5    372 (1964) (quotations and citations omitted). The vagueness doctrine does not require

6    "mathematical certainty" or "meticulous specificity" and permits "flexibility and reasonable

7    breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). However, a state law or policy

8    may be unconstitutionally vague when (1) it does not "give the person of ordinary intelligence a

9    reasonable opportunity to know what is prohibited" or (2) it encourages or invites "arbitrary and

10   discriminatory enforcement." *Id.* at 108. "[W]here the guarantees of the First Amendment are at

11   stake the [Supreme] Court applies its vagueness analysis strictly" to avoid a chilling effect on the

12   exercise of those freedoms. *Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988); *Foti v.*

13   *City of Menlo Park*, 146 F.3d 629, 638 (1998) ("[W]hen First Amendment freedoms are at stake,

14   an even greater degree of specificity and clarity of laws is required.").

15        In their motion to dismiss, Defendants reassert that Plaintiffs have no right to expression

16   on the College bulletin boards. (Doc. 15 at 27.) As explained above with respect to the

17   overbreadth challenge, this argument fails. Defendants also contend the policy "is clear and sets

18   for [sic] the proper criteria that would allow a reasonable person to understand the specific

19   parameters to posting on the interior walls." (*Id.*) Defendants proffer no explanation regarding

20   what those "specific parameters" are or how to reasonably interpret "inappropriate or offense."

21        Plaintiffs, on the other hand, argue the Flyer Policy does not give a person of ordinary

22   intelligence a reasonable opportunity to know what speech is prohibited under the "inappropriate

23   or offense" provision. (Doc. 5 at 22.) The Court agrees. The Flyer Policy does not "sufficiently

24   identify the conduct that it prohibits." *See U.S. v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996).

25   The Supreme Court and the Ninth Circuit have struck down statutes containing the term

26   "offensive" as insufficiently clear. *Id.* (attorney ethics rule prohibiting "offensive personality" has

27   no limitations within the context of the statute to provide sufficient clarity on what conduct it

28   prohibits); *see also Cohen v. California*, 403 U.S. 15, 16, 24-25 (1971) ("disturb(ing) the peace ...

by ... offensive conduct" fails to give sufficient notice of what was prohibited). The terms "offensive" and "inappropriate" lack a commonly understood meaning such that students are left to guess what speech violates the Flyer Policy. *See Cramp v. Board of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 287 (1961) ("If persons of common intelligence must necessarily guess at its meaning and differ as to its application it violates the due process of law and is unconstitutionally vague."). For example, "inappropriate" may apply to flyers containing profanity, or it could apply to flyers that simply have no connection to the student population or campus events. Nothing in the Flyer Policy resolves this ambiguity or contextual defines "offensive" or "inappropriate" such that students may reasonably understand that prohibition's boundaries. *See Diaz v. Watts*, 189 Cal. App. 3d 657, 666, 670 (1987) (upholding prohibition against "material offensive to any race, gender, nationality, religious faith or similar group" because the context of the law limited the restriction to "offensive in a manner as to disrupt intergroup peace").

Plaintiffs also argue the Flyer Policy invites arbitrary and discriminatory enforcement. (Doc. 5 at 22-24.) A law invites arbitrary and discriminatory enforcement when enforcement is unpredictable or when it permits an *ad hoc* and subjective basis for the application of the challenged law to speech. *See Foti*, 146 F.3d at 638-39 (holding a ban on signs on public property unconstitutionally vague because the law permits police officers to consider many factors to determine whether to enforce the ban in a given situation, including the officer's subjective distaste for the message). The Supreme Court observed that a restriction on "offensive" speech lacked a "sensible basis for distinguishing what may come in from what must stay out" because it invites wide discretion in its applications and is not susceptible to reasoned interpretation. *Mansky*, 138 S. Ct. at 1888; *see also Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 930-31 (noting the regulation banning license plate configurations that carry connotations "offensive to good taste and decency" lacked "objective, workable standards" to determine what is prohibited).

Defendants' basis for enforcing the Flyer Policy against Plaintiffs exemplifies the kind of arbitrary and discriminatory treatment that the vagueness doctrine is designed to prevent. Defendants contend they disapproved of Plaintiffs' flyers because they did not have a local

student organization identifier or did not relate to a campus matter. (Doc. 13 at 4, 7.) However, the emails exchanged among the College administrators reveal that their concern about the YAF flyers developed only after receiving complaints from students that the flyers made them "uncomfortable." (Doc. 6-2 at 2.) After having decided to remove the flyers, Defendant Bennett stated, "If you need a reason, you can let [Plaintiffs] know that Marco and I agreed they aren't club announcements." (Doc. 6-7 at 2.) These emails suggest Defendants formalized their justification for banning the YAF flyers *after* first deciding they needed to be removed. Defendants' ad hoc decision-making highlights the unpredictable and arbitrary enforcement that the ambiguous Flyer Policy enables. *See Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996) (holding the college policy prohibiting conduct which has the "effect of . . . creating an intimidating, hostile, or offensive learning environment" was impermissibly vague as applied to the professor's assigning of provocative essays on controversial topics because the college used an ad hoc basis to apply the policy's "nebulous outer reaches" rather than the "core region of sexual harassment" as defined by the policy). Accordingly, the Court finds Plaintiffs demonstrated a likelihood of success on the merits of their claim that the "inappropriate or offense language or themes" provision of the Flyer Policy is unconstitutionally vague.

4. Prior Restraint

Plaintiffs argue the College Flyer Policy acts as an impermissible prior restraint on student speech. (Doc. 5 at 15-16.) None of Plaintiffs' authority, however, pertains to the standards applied to a prior restraint in nonpublic forums. (*See id.*) Plaintiffs rely on the framework from *Freedman*, which provides procedural safeguards for when state or local governments require preapproval on censorship of speech in *private* forums, such as restrictions on Freedman's displaying a film in his own theater. *Freedman v. State of Maryland*, 380 U.S. 51, 58-59 (1965); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 59-61 (1963) (evaluating constitutionality of a state commission designed to regulate circulation of any printed material containing obscene, indecent or impure language); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 220, 225-26 (1990) (assessing permissibility of a zoning and licensing ordinance imposed against an adult bookstore); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (determining constitutionality of barring the

New York Times from publishing a classified government study). Plaintiffs have not provided any authority that applies *Freedman*'s procedural safeguards to cases involving restrictions on speech on government property, where the forum analysis usually governs the constitutional analysis. For example, in *Cuviello*, the Ninth Circuit did not rely on the *Freedman* framework when evaluating a prior restraint in a public forum. *Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019). Instead, the Ninth Circuit outlined four criteria unrelated to the *Freedman* framework. *Id.* These criteria include, *inter alia*, "the system must not be based on the content of the message," which correlates to prohibition on speech under the traditional forum analysis for public and designated public forums. *Id.*

Plaintiffs' authorities suggest that *Freedman* does not apply in the context of speech on government property, but rather the permissibility of prior restraints on government property depends on the forum type. *See id.*; *see also Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 149 (1969) (majority opinion contains no reference to or application of the *Freedman* framework when evaluating a prior restraint in a public forum); *Berger*, 569 F.3d at 1035 (same). Plaintiffs' authorities, however, do not define the standards applied to prior restraints in a *nonpublic* forum, which traditionally differ from those in public forum. *See Cornelius*, 473 U.S. at 806. The Ninth Circuit warned against using the prior restraint standards derived from cases involving *public* forums for cases involving *non*public forums. *See Hale v. Dep't of Energy*, 806 F.2d 910, 917 (9th Cir. 1986) (explaining *Shuttleworth*, in which the Supreme Court invalidated a permit system for access to public walkways and streets, does not apply to restrictions on nonpublic forums); *see also Desyllas v. Bernstine*, 351 F.3d 934, 943 (9th Cir. 2003) ("[T]he standard by which limitations upon [speech rights on public property] must be evaluated differ[s] depending on the character of the property at issue.") (alterations in original). Without the relevant authority from either party or a proper analysis of the facts, the Court declines to determine the prior restraint challenge at tis time. Furthermore, having found a likelihood of success under the overbreadth and vagueness claims, a determination on the prior restraint challenge is unnecessary to issue the preliminary injunction.

5.   <u>Viewpoint Discriminatory as Applied to Plaintiffs</u>

In addition to their facial constitutional challenges, Plaintiffs also contend Defendants acted discriminatorily in applying the Flyer Policy to the YAF flyers. (Doc. 5 at 24-25.) Plaintiffs maintain Defendants disfavored the YAF flyers because of the espoused anti-communist and pro-life viewpoints. (*Id.* at 24.) They further allege Defendants' stated reason for removing or banning the flyers—because they did not contain "club announcements"—is a pretextual, post-hoc justification that the College has not enforced on other student groups. (*Id.*) Defendants disagree, claiming they did not enforce the Flyer Policy in a discriminatory manner, but rather prohibited the YAF flyers only when they did not contain the relevant local club information, and typically only allow students to "post announcements regarding groups, events, and services that may interest students." (Doc. 13 at 4-7.) Having already determined Plaintiffs showed a likelihood of success on the overbreadth and vagueness claims, the Court need not resolve the parties' factual disputes at this stage.

**B.**   **Irreparable Harm**

Defendants argue that Plaintiffs failed to demonstrate they would suffer irreparable harm in the absence of a restraining order. (Doc. 13 at 7-9.) Defendants contend Plaintiffs have suffered no harm in this case because the College approved their flyers after Plaintiffs added their club identifier and because the Free Speech Kiosk provides an alternate forum where Plaintiffs may post their messages.[11] (*Id.* at 8.) In reply, Plaintiffs contend the College's removal of their Freedom Week Flyers and "banning of Plaintiffs' messages from the bulletin boards *because* of their content and viewpoints" evidence irreparable harm. (Doc. 21 at 10 (emphasis in original).) Further, Plaintiffs assert that they "reasonably believe" the College, through the Flyer Policy, will refuse future attempts by Plaintiffs to hang YAF flyers. (*Id.*)

The Court need not resolve the factual dispute as to whether *actual* irreparable harm exists. In cases involving First Amendment challenges, irreparable injury is often presumed when

---

[11] Defendants also contend Plaintiffs have not suffered and would be unlikely to suffer any irreparable harm because they have no constitutional right to post on the bulletin boards because the SCCCD designated the boards as non-public forums. (Doc. 13 at 7-8.) This argument conflates the irreparable harm element with likelihood of success, which the Court has already addressed.

1  the plaintiff demonstrates a "colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.

2  3d 989, 1001-02 (9th Cir. 2005). The mere threat of enforcement of an unconstitutional restriction

3  on speech may create a chilling effect sufficient to show irreparable harm. *Cuviello*, 944 F.3d at

4  831-33 (holding the permit system, which required plaintiff to obtain approval from the chief of

5  police to use a bullhorn on a public sidewalk, creates a temporary limitation on speech such that

6  likelihood of irreparable harm exists). Permit systems, which require preapproval for the

7  individual to speak, further increase the concern of chilling speech. *Id.* at 832; *see also Berger*,

8  569 F.3d at 1037-38 ("Both the procedural hurdle of filling out and submitting a written

9  application, and the temporal hurdle of waiting for the permit to be granted may discourage

10  potential speakers.").

11          Even a temporary restriction on speech and even for minimal periods of time constitutes

12  irreparable injury. *Curviello*, 944 F.3d at 832. ("The temporal hurdle eliminates the possibility of

13  spontaneous speech, which may disproportionately burden political speech that must respond to

14  changing current events.") For example, according to Defendant Hébert's declaration, the

15  College's permit system resulted in a one-month delay of Plaintiffs hanging their Pro Life Flyers.

16  (Doc. 13-1 at 5, ¶¶ 12-14.) Because the Court found Plaintiffs established a likelihood of success

17  that the Flyer Policy is unconstitutionally overbroad and vague, they have demonstrated a

18  colorable First Amendment claim. Accordingly, the Flyer Policy's preapproval system banning

19  "inappropriate or offens[ive]" speech creates a presumption of irreparable harm, even in the

20  absence of actual harm. *See Am. Booksellers Found. For Free Expression v. Sullivan.*, 2010 WL

21  11453161, at **2-3 (D. Alaska Oct. 20, 2010) (finding likelihood of irreparable harm caused by a

22  state law that criminalized certain speech related to sexual assault and domestic violence because

23  it created a danger of "self-censorship," even without any actual harm alleged).

24  **C.      Balance of Equities and Public Interest**

25          The two remaining factors of a motion for a preliminary injunction—balance of equities

26  and the public interest—also weigh in favor of Plaintiffs. "When the government is a party, these

27  last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

28  Defendants argue "if the Plaintiff were [sic] to succeed and there was not limitation on speech

from the policy it could allow for all forms of posting including: hate speech, speech inciting violence, and racism that are not associated with any college club or student group." (Doc. 13 at 9.) As Plaintiffs stated during the hearing, the injunction will not prevent the College from crafting a new policy that is viewpoint neutral and provides objectively reasonable standards for determining what is prohibited. The injunction only extends to enjoin the enforcement of the "inappropriate or offense language or themes" provision of the Flyer Policy and requiring preapproval of flyers on this basis. The injunction, therefore, does restrict any policies the College may have, or may implement, that prohibit speech that is *not* protected under the First Amendment, such as language which incites violence or true threats. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 384-85 (1992). By further example, the College may more narrowly tailor its flyer guidelines to prohibit "harassment" or "intimidation" that "threatens or endangers the health or safety" of others, which the Ninth Circuit concluded is not impermissibly overbroad or vague. *See O'Brien v. Welty*, 818 F.3d 920, 930-31 (9th Cir. 2016).

The injunction's relatively minor restriction on the College does not outweigh the significant interest accorded to the entire student body because it alleviates the potential chill of free speech currently caused by the Flyer Policy. *See Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("[T]his court has consistently recognized the significant public interest in upholding First Amendment principles.) (quotations omitted); *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)) (concluding that the "balance of equities and the public interest thus tip sharply in favor of enjoining [an anti-litter] ordinance" that prohibited leafleting on unoccupied parked vehicles because the ordinance "infringes on the free speech rights not only of [plaintiff], but also of anyone seeking to express their views in this manner in the City"). Accordingly, Plaintiffs have met all factors to warrant a preliminary injunction.

**D.     Indispensable Parties**

Separate from the preliminary injunction factors, Defendants argue a preliminary injunction is inappropriate because Plaintiffs "failed to name indispensable parties for this motion." (Doc. 13 at 10.) Defendants contend that other college officials, not named in the

complaint, are authorized to enforce the Flyer Policy, and therefore, any injunction, which may issue, cannot afford the relief sought. (*Id.*) Defendants further contend that they merely uphold polices adopted or approved by the College Board of Trustees and the SCCCD, and Defendants have no authority to alter them. (*Id.*). Throughout their opposition, Defendants rely heavily on the fact that the SCCCD, the College's governing board with regulatory authority, issued the AR 5550 regulation, to allegedly authorize Defendants' actions in limiting Plaintiffs' speech on campus. (Doc. 13 at 3, 6-8.)

The AR 5550 provides general guidance that designates certain areas on campus as nonpublic and limited public forums for the purposes of student speech. (Doc. 13-2 at 7-8.) The AR 5550 also explains that "Students shall be provided with bulletin board for the use in posting student materials at campus locations convenient for student use." (*Id.* at 8.) It requires postings on bulletin boards to clearly indicate the "author or agency" responsible for the posting. (*Id.*) Plaintiffs maintain, however, that they do not challenge the restrictions of the AR 5550. (Doc. 21 at 4.) They only take issue with the College's Flyer Policy, which prohibits "inappropriate or offense language or themes" and Defendants' enforcement of that policy to restrict the YAF flyers from the College's bulletin board. (*Id.* at 4-5.)

Under Federal Rule of Civil Procedure 19(a), the SCCCD and College Board of Trustees are not indispensable parties. Rule 19(a) explains a party is required if: (1) the court "cannot accord complete relief among the existing parties" or (2) the non-party claims an interest in the action and the non-party's absence causes either an impediment to the non-party to protect its interest or leaves an existing party subject to "substantial risk of incurring double, multiple, or otherwise inconsistent obligations" because of the non-party's interest.

Plaintiffs named the necessary defendants based upon the claims they bring. Because Plaintiffs do not challenge the AR 5550 and the named Defendants maintain authority over the challenged Flyer Policy, the court can "accord complete relief among existing parties," without SCCCD, Board of Trustees, or other College officials as parties to this action. Defendants do not dispute that they have responsibility for ensuring compliance with all federal, state, and College policies. (Doc. 13-2 at 2-3, ¶ 2; Doc. 21 at 5.). Moreover, courts commonly recognize that

1   injunctions can be enforced against the top official of a college for policies that run afoul of the

2   First Amendment. *See e.g., Koala v. Khosla*, 931 F.3d 887, 892-93 (9th Cir. 2019) (First

3   Amendment challenge brought against university chancellor); *Perlot v. Green*, 2022 WL

4   2355532, at **14-15 (D. Idaho June 30, 2022) (granting preliminary injunction against university

5   president and other college officials to prevent enforcement of a no-contact order which had a

6   likelihood of being unconstitutional under the First Amendment). Finally, no other party, such as

7   SCCCD or the Board of Trustees, has claimed an interest in this action, making the remaining

8   provisions of Rule 19(a) inapplicable. Accordingly, failure to join the SCCCD, the College Board

9   of Trustees, or other College officials does not constitute a valid reason to deny the preliminary

10   injunction.

11   **E.       Security Payment**

12          Plaintiffs requested that the Court not require them to provide a security payment

13   "because there is not realistic likelihood of harm to Defendants if the Court grants a preliminary

14   injunction." (Doc. 5 at 27.) Plaintiffs argue that Federal Rule of Civil Procedure 65(c) does not

15   impose a mandatory security payment but rather the issue lies within the discretion of the Court.

16   (*Id.* (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may

17   dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

18   defendant from enjoining his or her conduct.")).) Because Defendants did not oppose this request,

19   the Court, in its discretion, finds no security payment or bond is necessary.

20                                        **V.       ORDER**

21          For the reasons stated above, the Court hereby **ORDERS**:

22          1.      Plaintiffs' motion for a preliminary injunction (Doc. 4) is **GRANTED**.

23          2.      Defendants are enjoined from enforcing the Flyer Policy in so far as it requires

24                  preapproval from College administrators or staff and prohibits "inappropriate or

25                  offense language or themes."

26   ///

27   ///

28   ///

3.      Plaintiffs' motion to file a supplemental declaration (Doc. 24) is **DENIED**.

IT IS SO ORDERED.

Dated:   **October 14, 2022**

UNITED STATES DISTRICT JUDGE